In re Inger S. KOPF, Debtor.

Inger S. Kopf, Plaintiff,

v.

United States Department of
Education, Defendant.

Bankruptcy No. 99–10178.
Adversary No. 99–1038.

United States Bankruptcy Court,
D. Maine.

Feb. 29, 2000.

Bronson Platner, Ellsworth, ME, for Plaintiff.

Frederick C. Emery, Jr., Assistant U.S. Attorney, Portland, ME, for Defendant.

Gary M. Growe, Bangor, ME, Chapter 7 Trustee.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Chief Judge.

Before me on a stipulated record is Inger Kopf's request that the educational loans she owes to the United States Department of Education (the "Department") be discharged pursuant to § 523(a)(8) of the Bankruptcy Code.[1] For the reasons set forth below, I conclude that Ms. Kopf has not demonstrated that excepting her student loan obligation from discharge will subject her to undue hardship within the meaning of § 523(a)(8). Therefore, the loans will not be discharged.

### Facts

The parties have stipulated to the following facts:

1. Kopf's take-home pay from her job in retail [sales] is $306.44 per week, after deducting $73.56 for state and federal taxes. Her monthly take-home pay is $1328.

2. Kopf's monthly expenses are $1262, excluding any "extraordinary expenses."[2]

3. Kopf is divorced and solely supports herself and her five-year-old son.

4. Kopf took out the student loans in question to pursue a Bachelor's Degree in Wildlife Biology. She never completed the program, having left school when her ex-spouse became seriously ill.

5. Kopf is indebted on five student loans for a total original principal amount of $12,550: an August 2,

1984, loan for $2500; an August 8, 1985, loan for $2500; a January 15, 1986, loan for $1000; a September 4, 1986, loan for $2500, and a December 3, 1987, loan for $4050.

6. The June 1, 1988, "Repayment Schedule/Disclosure Statement" indicates a $12,500 balance and projected interest of $5608. The total of $18,108 was divided into 120 payments (10 years) of $139.40 a month to commence December 28, 1988.[3]

The parties have also stipulated that although the Department's administrative regulations do not provide for discharge of student loans based solely on economic hardship, they do permit Kopf to apply for an amended (decelerated) repayment schedule based on income and expenses. If Kopf were unable to make monthly payments, her payment would be "set at zero."

### Discussion

#### A. The Statute

The Code provides that Kopf's Chapter 7 discharge does not include the discharge of a debt,

> for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, *unless* excepting such debt from discharge un-

---

1. This memorandum sets forth my conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. Although the basic facts are stipulated, my decision is based on additional facts logically drawn from the stipulated record. *See, e.g., Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.),* 132 F.3d 104, 107–08 (1st Cir.1997).

 Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101 *et seq.*

2. An item-by-item breakdown of Ms. Kopf's expenses is set forth *infra* as I apply the law to the facts.

3. It appears from the loan account print-outs, incorporated as part of the stipulated facts, that Kopf made a $10.00 principal payment prior to July 26, 1989. There is no information in the record regarding the current account balance or projected monthly payment obligation. Kopf scheduled the Department of Education as holding a claim of $14,-761.82.

der this paragraph will impose an undue hardship on the debtor and the debtor's dependants[.]

§ 523(a)(8)(emphasis added).

### B. Jurisdiction

My § 523(a)(8) determination is a core matter pursuant to 28 U.S.C. § 157(b)(2)(I) on which I enter final judgment. *See Green v. Sallie Mae Servicing Corp. (In re Green)*, 238 B.R. 727, 732 (Bankr.N.D.Ohio 1999).

### C. Burden of Proof

■ Kopf bears the burden of proving she is entitled to a discharge of her student loans by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of the evidence standard for dischargeability complaints); *Douglass v. Great Lakes Higher Educ. Servicing Corp. (In re Douglass)*, 237 B.R. 652, 655 (Bankr.N.D.Ohio 1999)("In dischargeability matters, the burden of proof is upon the complainant who must demonstrate a sustainable basis for its action by a preponderance of the evidence."); *accord Johnson v. USA Funds, Inc. (In re Johnson)*, 121 B.R. 91, 92–93 (Bankr.N.D.Okla. 1990); *Lohman v. Connecticut Student Loan Found. (In re Lohman)*, 79 B.R. 576, 578 & n. 5 (Bankr.D.Vt.1987).[4]

### D. Economic Hardship as Part of the § 523(a)(8) Analysis

■ The United States argues that I need not review the debtor's "personal and financial facts and circumstances" because "facts and circumstances relating only to an economic hardship on a debtor and a debtor's dependants" are not relevant to the § 523(a)(8) inquiry.

Admitting the absence of any buttressing statutory or decisional authority, the Department "relies upon logic and reason in support of its position." It offers three observations on the Code and the Department's procedures to support its viewpoint. First, Congress has strung together "an ever increasing list of debts under § 523 which are non-dischargeable in a Chapter 7." Most of them operate without reference to the debtor's post-discharge financial status.[5] Second, Congress recently constricted the dischargeability of student loans, eliminating the § 523(a)(8) seven-year time limit on nondischargeability with the 1998 Bankruptcy Code amendments.[6] Third, debtors may take advantage of the Department's regulations providing loan repayment relief based on economic hardship. Debtors with "only" economic hardship should be "relegated" to these administrative options.

I decline to take the United State's pie-in-the-sky approach to statutory interpretation. When Congress eliminated the seven-year discharge provision from

---

4. Some courts employ a "shifting burdens" model for § 523(a)(8) litigation. *See Perry v. Student Loan Guarantee Found. of Arkansas (In re Perry)*, 239 B.R. 801, 808–09 (Bankr. W.D.Ark.1999) (with respect to the undue hardship showing, burden can shift from creditor to debtor and back to creditor); *In re Green*, 238 B.R. at 734 & n. 6 (creditor has initial burden of establishing the existence of a student loan debt and the debtor bears the burden to prove by a preponderance that her circumstance constitute undue hardship). Where, as here, the debtor commences suit acknowledging that the obligations in contest are educational loans within the meaning of the statute, it is unnecessary to consider the propriety of that model.

5. The government's argument overlooks at least one recently-enacted discharge exception that operates as a function of a debtor's post-bankruptcy "ability to pay." *See* § 523(a)(15)(A).

6. The 1998 amendment to § 523(a)(8) eliminated subsection (A), which removed from the discharge exceptions loans that "first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition." § 523(a)(8)(A)(repealed October 7, 1998). *See, e.g., Rudnicki v. Southern College of Optometry (In re Rudnicki)*, 228 B.R. 179 (6th Cir. BAP 1999)(addressing the calculation of the seven year period vis-a-vis consolidated loans).

§ 523(a)(8), it left the statute's "undue hardship" provision intact.[7] Though Congress may be taking a progressively restrictive approach to student loan discharge in bankruptcy, that fact does not give me license to identify a trend and, based on that trend, to limit student loan dischargeability in ways contrary to the statute's language.

The Department's administrative policies may provide repayment *relief* to needy debtors, but, as the government concedes, they do not provide for *discharge* of student loans. The Code establishes that student loans may be *discharged* upon a debtor's showing of "undue hardship." That term's content has long included consideration of a debtor's economic circumstances—his or her ability to repay the debt according to its terms. The fact that a creditor may assert its willingness to wait for repayment—for however long—does not equate with the obligation's discharge.[8] And, so long as Congress has provided an avenue by which the debtor may discharge an obligation, the courts must apply the law as written, no matter how strenuously, or how formally, a creditor protests that its post-bankruptcy collection efforts will be humanely executed.[9]

7. The Joint Explanatory Statement of the Committee of Conference for the Higher Education Amendments of 1998 stated:

The conferees, in the effort to ensure the budget neutrality of this bill, adopted a provision eliminating the current bankruptcy discharge for student borrowers after they have been in repayment for seven years. The conferees note that this change does not affect the current provisions allowing any student borrower to discharge a student loan during bankruptcy if they can prove undue economic hardship. The conferees also note the availability of various options to increase the affordability of student loan debt, including deferment, forbearance, cancellation and extended, graduated, income-contingent and income-sensitive repayment options.

H.R. Conf. Rep. No. 750 (1998), U.S.Code Cong. & Admin. News p. 404.

Courts applying the 1998 amendment have assumed that the meaning of "undue hardship" is unaffected by the elimination of the seven-year limitation on nondischargeability. *See, e.g., Great Lakes Higher Educ. Corp. v. Brown (In re Brown)*, 239 B.R. 204, 207–12 (S.D.Cal.1999); *In re Green*, 238 B.R. at 733 & n. 3; *Phelps v. Sallie Mae Loan Serv. Ctr. (In re Phelps)*, 237 B.R. 527, 534 n. 4 (Bankr. D.R.I.1999). That proposition is subject to question.

Although the two subsections of former § 523(a)(8) are generally described as two discrete exceptions, *see TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 927 (1st Cir. 1995) ("Congress delineates only two exceptions to this [student loan] nondischargeability policy."), historically there has been some practical interplay between them. The undue hardship inquiry was only invoked by debtors within the early years of their loan repayment period. This dynamic influenced some courts in their application of the "undue hardship"

exception. *See Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 299–300, 305 (3d Cir.1995)("The *Brunner* standard meets the practical needs of the debtor by not requiring that he or she live in abject poverty for up to seven years before a student loan may be discharged."); *Brunner v. New York State Higher Educ. Ser. Corp. (In re Brunner I)*, 46 B.R. 752, 754–55 (S.D.N.Y. 1985) (hereinafter *In re Brunner I* )("It is the nature of § 523(a)(8)(B) [undue hardship] applications that they are made by individuals who have only recently ended their education," and thus require a showing of "additional circumstances which strongly suggest that the current inability to pay will extend for a significant portion of the repayment period of the loan.").

8. Reducing the monthly obligation to "zero," will only postpone repayment indefinitely and, unless interest is abated, permit additional interest accruals.

9. Frankly, if financial hardship were eliminated from the § 523(a)(8) analysis, one would be hard pressed to identify what sort of hardship would be left to consider. Physical or mental disabilities may play a role in the calculus, but, generally speaking, their significance is in how they translate to an inability to repay debt. Would it not be inappropriate for a disabled millionaire to seek discharge of student loans on account of a disability that created only nonfinancial hardship? *See, e.g., Barrows v. Illinois Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 647, 649–50 (Bankr.D.N.H.1994) (debtor/dentist with "a series of physical problems" not entitled to an undue hardship discharge as she "demonstrated unfailing perseverance and stamina in surmounting each barrier before her" and owned a dental practice that had "promise as a lucrative and growing business").

## E. The "Undue Hardship" Inquiry

■ Without express statutory definition, "undue hardship" has proved an eely notion. Courts have long struggled to articulate its content. *See Tennessee Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 437 (6th Cir.1998); *In re Faish*, 72 F.3d at 299–300, 302–03; *In re Roberson*, 999 F.2d 1132, 1134 (7th Cir.1993); *In re Brunner I*, 46 B.R. at 753; *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 137 (8th Cir. BAP 1999); *In re Green*, 238 B.R. at 733; *Mathews v. Higher Educ. Assistance Found. (In re Mathews)*, 166 B.R. 940, 943 (Bankr.D.Kan.1994); *In re Lohman*, 79 B.R. at 580; *In re Johnson*, 121 B.R. at 93.[10] Three primary undue

10. As discussed in the context of the merits and demerits of the rival tests below, most courts have looked to the statutory history of the "undue hardship" student loan provision for guidance. *See, e.g., In re Lohman*, 79 B.R. at 580–81; *In re Brunner I*, 46 B.R. at 753. However, as the *In re Brunner I* court recognized "Congress itself had little to say on the subject." *In re Brunner I*, 46 B.R. at 753–54. The House bill made no reference to student loans and the Senate Report made no mention of "undue hardship" when referring to what was then the five year ceiling for nondischargeability of student loans. *See id.* The Compromise bill accepted the Senate's language but there was no mention of "undue hardship" in the compromise report. *See id.* at 754.

Without much attention to the propriety of looking beyond the Congressional product for the meaning of "undue hardship," the *In re Brunner I* court, and many courts following its footsteps, *see, e.g., In re Lohman*, 79 B.R. at 580–81, turned to the *Report of the Commission on the Bankruptcy Laws* for "some inkling of its intent in creating the exception, intent" it reasoned, "which in the absence of any contrary indication courts have imputed to Congress." *In re Brunner I*, 46 B.R. at 754 (citing *Report of the Commission on the Bankruptcy Laws of the United States*, House Doc. No 93–137, Pt. I, 93 Cong., 1st Sess. (1973) at 140 n. 14).

The cited portions of the 1973 report commented on the "rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts" and a concern that the trend would continue. *Report of the Commission on the Bankruptcy Laws of the United States*, House Doc. No 93–137, Pt. I, 93 Cong., 1st Sess. (1973) at 140 n. 14. The Commission recommended the insertion of a separate student loan exception to discharge "to provide for limited nondischargeability of educational loan debts" and cited two reasons:

First, a loan or other credit extended to finance higher education that enables a person to earn substantially greater income over his working life should not as a matter of policy be dischargeable before he has demonstrated that for any reason he is unable to earn sufficient income to maintain himself and his dependents and to repay the educational debt. Second, such a policy cannot be appropriately carried out under any other nondischargeability provision.... [Other nondischargeability provisions] neither provide for nondischargeability of debts incurred honestly which the debtor subsequently decides not to pay nor distinguish between persons scheduling educational debts who, under the general "fresh start" policy of the proposed Act, should and those who should not be enabled to discharge them.

*Id.* at n. 15.

In contrast to the enacted "or" construction between former subsections § 523(a)(8)(A) and (B), the Commission suggested an "and" construction, excepting from the discharge, any educational debt if the first payment of any installment thereof was due on a date less than five years prior to the date of petition *and* if its payment from future income or other wealth will not impose an undue hardship on the debtor and his dependents[.]

*Id.* at 136 (emphasis added).

The Commission proposed a test for determining "undue hardship":

In order to determine whether nondischargeability of the debt will impose an "undue hardship" on the debtor, the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected. Any unearned income or other wealth which the debtor can be expected to receive should also be taken into account. The total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.

*Id.* at 140–41 n. 17.

As proposed by the Commission, the exception to otherwise matter-of-course student loan discharge was "limited." Under no circumstances would the exception persist beyond five years and it would only apply in the

hardship tests have emerged: the *In re Johnson* test, the *In re Brunner* test, and the "totality of the circumstances" test. *See In re Andresen,* 232 B.R. at 137–40 (comprehensive review of "undue hardship" tests and variations thereon); *In re Green,* 238 B.R. at 733 n. 14 (summarizing four "undue hardship" tests). *See also In re Faish,* 72 F.3d at 303–05 (reviewing competing tests but not "totality of the circumstances")."[11]

### 1. Testing the Tests

Although I am wont to belabor the discussion, it is necessary to labor a little. The parties before me deserve to know which test I apply and why.[12]

### a. The In re Johnson Test

■ *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson)* is a seminal § 523(a)(8) decision, referred to by most courts applying the student loan discharge exception. 5 B.C.D. 532 (Bankr.E.D.Pa.1979). Some courts employ elements drawn from its model and others apply the test *in toto.*

first five years of repayment if repayment did not interfere with the debtor's ability to run a household at a minimum standard of living. In other words, only debtors who were capable of paying the student loan obligation in the first five years by keeping their shoulders to the grindstone and cutting their coupons (or by remaining in good graces with their ascendants) would be subject to the exception.

**11.** As discussed *In re Green* and *In re Faish,* there is also the "Bryant Poverty Level Test." If the debtor falls below the federal poverty level, an "undue hardship" discharge of the student loans is in order. *See Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant),* 72 B.R. 913, 915–19 (Bankr.E.D.Pa. 1987). Either the debtor or the creditor may rebut this determination by a showing of extenuating circumstances. *See id.* at 915. The test is a product of efforts to instill objectivity into the undue hardship inquiry, but it has gained few adherents. I will not discuss it further.

**12.** The First Circuit has not yet addressed undue hardship issues. Its only § 523(a)(8) decision holds that federal credit unions are

*See In re Lohman,* 79 B.R. at 582–84. Decided just after the Bankruptcy Code's enactment, *In re Johnson* drew on myriad extra-statutory sources to discern "undue hardship's" content.[13]

The *Johnson* court articulated a "mechanical test" for "undue hardship," *id.* at 539, employing a "checklist of factors," *id.* at 536, against which to compare the facts of each case. The court considered the debtor's rate of pay, wages and/or salaries earned, skills, sex, ability to obtain or retain employment, current employment status, employment record, education, health, access to transportation, and dependents. *See id.* at 537–38. It also considered other sources of income or wealth. *See id.* at 538. The inquiry then addressed the debtor's expenses, looking, first, at what expenses would be necessary for a hypothetical debtor in a similar situation, and, second, at any extraordinary expenses special to the debtor before it. *See id.* at 538. The aim was to determine whether the debtor's "future financial resources for the longest foreseeable period of time al-

"governmental units" for purposes of § 523(a)(8). *See TI Federal Credit Union,* 72 F.3d 921.

**13.** The court examined a "paucity of cases" interpreting 20 U.S.C. § 1087–3 (1978), a non-Code student loan nondischargeability provision containing a similar "undue hardship" provision. *In re Johnson,* 5 B.C.D. at 537. It described § 1087–3 as having been repealed in apparent anticipation of the Bankruptcy Code. *See id.* at 532–33. Like the initial version of § 523(a)(8), 20 U.S.C. § 1087–3 included a five-year ceiling on nondischargeability and an exception to the five-year wait, "if the court in which the proceeding is pending determines that payment from future income or other wealth will impose an undue hardship on the debtor or his dependents." *Id.* at 532 (quoting 20 U.S.C. § 1087–3 (1978)). The *In re Johnson* court also reviewed the Report of the Commission on The Bankruptcy Laws (*see supra* note 7), drew heavily from a law journal article, and quoted at length from three expressions of student loan lenders' viewpoint that were included in the Bankruptcy Revision Hearings record. *See id.* at 536–43.

lowed for repayment of the loan, [would] be sufficient to support the debtor and his dependent[s] at a subsistence or poverty standard of living, as well as to fund repayment of the student loan." *Id.* at 544. If not, loan repayment would impose an "undue hardship" on the debtor. *See id.*

*In re Johnson* did not, however, stop with the assessment of "undue hardship." It required that at least one of two additional tests be applied: the "good faith" probe and a "policy" inquiry.

To pass the "good faith test" the debtor must show that he or she had made a "bona fide attempt to repay the loan." *See id.* at 540 (citing A. Ahart, *Discharging Student Loans in Bankruptcy*, 52 Am. Bankr.L.J. 201, 207 (Summer 1978)). The inquiry does not focus on whether the debtor is making payments, but also considers if the debtor is minimizing expenditures, maximizing resources, and making efforts to attain employment. *See id.* at 541–42. If the debtor is not "negligent or irresponsible in his efforts to minimize expenses, maximize resources, or secure employment," he or she passes the good faith test and discharge of the student loans is in order. *Id.* at 544.

If the debtor meets the mechanical undue hardship test only because they have negligently managed their affairs or were irresponsible, *see id.,* (that is, if repaying the loan would not cause undue hardship if the debtor had acted in "good faith," *see id.* at 542),[14] there remains a final chance to discharge the student loans. That requires passing the third test of the *In re Johnson* hat trick: the "policy test." *Id.* at 542–44.

Under *In re Johnson*'s policy test, the court must examine the pros and cons of discharging the student loan(s) in light of the policy behind § 523(a)(8) and repealed 20 U.S.C. § 1087–3 (1978): "to combat the abuse of the bankruptcy laws by recently-graduated students." *Id.* at 542. Thus, the court considered,

the amount of the educational debt, the percentage of the [debtor's] total indebtedness which is composed of student loans, and the extent to which the debtor's college education has enhanced his earning capacity.

*Id.* at 543. If the court concludes either that "the dominant purpose of the bankruptcy petition was to discharge the student [loan] debt" or "the debtor has definitely benefit[t]ed financially from the education which the loan helped to finance," it will not except the student loans from discharge. *See id.* at 544

### b. The In re Brunner Test

■ The *In re Brunner* test, first articulated by the United States District Court for the Southern District of New York and adopted by the Second Circuit, determines that a student loan will be discharged for "undue hardship" if the debtor shows:

1) that the debtor cannot, based on current income and expenses, maintain a "minimal" standard of living for himself or herself and his or her dependents if forced to repay the loans, 2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan, and 3) that the debtor has made good faith efforts to repay the loans.

*In re Brunner I*, 46 B.R. at 756. *See also Brunner v. New York Higher Educ. Servs. Corp.,* 831 F.2d 395, 396 (2d Cir.1987)(adopting the test formulated by the District court) (hereinafter *In re Brunner II* ).

The district court required "some showing of 'good faith' " as its test's third prong, "following the lead" of *In re Johnson,* 5 B.C.D. 740, observing,

There is no specific authority for this requirement, but the need for some showing of this type may be inferred from comments of the Commission report. In discussing the discharge of loans after five years, when a showing of

14. The court also described this as "self-imposed hardship." *Id.* at 542

undue hardship is no longer required, the Commission noted that such discharge is fair because the debtor may be unable to repay his or her debts due to "factors beyond his reasonable control." If external circumstance were seen as justifying discharge after five years, it is likely that only such circumstances should be permitted to justify discharge prior to that time. The propriety of a requirement of good faith is further emphasized by the stated purpose for § 523(a)(8): to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed those loans. Thus it is proper to require a debtor to show that he or she has made good faith efforts to repay the loan and that the forces preventing repayment are truly beyond his or her reasonable control.

*In re Brunner I*, 46 B.R. at 755–56 (citations omitted).[15] *Accord Roberson v. Illinois Student Assistance Comm'n (In re Roberson)*, 999 F.2d 1132, 1136 (7th Cir. 1998); *In re Lohman*, 79 B.R. at 582. *See also supra* note 7 (quoting the Commission's report).

The *In re Brunner* test has many adherents. *See, e.g., United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111–12 (9th Cir.1998) (Ninth Circuit joining Second, Third, and Seventh Circuits in adopting *In re Brunner* rather than applying the Sixth Circuit's rendition applied by the Bankruptcy Appellate Panel below); *In re Faish*, 72 F.3d at 299–300

(Third Circuit adopting *In re Brunner* rather than the *In re Johnson* standard utilized by the district courts below); *In re Roberson*, 999 F.2d at 1135 (Seventh Circuit rejecting *In re Johnson* and adopting *In re Brunner* ).

#### c. The Totality of the Circumstances Test

■ Two circuit courts and numerous bankruptcy courts have preferred a "totality of the circumstances" test. The Eighth Circuit favored this approach early on, including in its review "an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources; (2) calculation of the debtor's and his dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding that particular bankruptcy case." *In re Andresen*, 232 B.R. at 139 (summarizing the *In re Andrews* considerations concluding that, while the Eighth Circuit has not expressly adopted or rejected *In re Brunner*, it had "expressed its preference for a totality of the circumstances test" in *In re Andrews* ). *See also Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981)(drawing on the "undue hardship" test articulated in the Commission's report as well as similar standards in case law).

The Sixth Circuit also employs a totality of the circumstances approach. Recently, in *In re Hornsby*, it declined to "adopt any one test," "instead look[ing] to many factors." 144 F.3d at 437. *See In re Green*,

**15.** For the propriety of requiring good faith efforts to repay and a showing nonpayment for reasons "truly beyond" the debtor's control *In re Brunner I* cites *Rappaport v. Orange Savings Bank (In re Rappaport)* 16 B.R. 615 (Bankr.D.N.J.1981). *See In re Brunner I*, 46 B.R. at 756. *See also In re Lohman*, 79 B.R. at 582 (portraying *In re Rappaport* as requiring a showing that the debtor "has made good faith efforts to repay the loan and that the forces preventing repayment are truly beyond his or her reasonable control"). That interpretation of *In re Rappaport* is a broad one. *In re Rappaport* did adopt what it described as

the prevailing view that " 'undue hardship' is generally associated with a total incapacity now and in the future to pay one's debts for reasons not within the control of individual debtor." 16 B.R. at 617. But as to prebankruptcy repayment efforts, it looked only to "whether a debtor has made a good-faith effort to negotiate deferment or forbearance of payment with the creditor." *Id.* at 618.

The Second Circuit brushed over this prong of the lower court's analysis, noting only that the debtor had not made an effort to repay and that she had not sought deferment. *See In re Brunner II*, 831 F.2d at 396–97.

238 B.R. at 734 (noting that the Sixth Circuit has relied on *In re Brunner I* but has deemed it appropriate that the court "consider other relevant factors depending on the unique circumstances of each individual case"). *See also Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996)(examining the "totality of the facts and circumstances surrounding the debtor and the obligation" in determining whether a Health Educations Assistance Loan (HEAL) was dischargeable under 42 U.S.C. § 292(g)(2)'s "unconscionable" standard).

One bankruptcy court in this circuit has expressly adopted the totality of the circumstances approach to undue hardship. *See In re Phelps*, 237 B.R. at 534–35 (Bankruptcy Court for the District of Rhode Island). Another has pursued an untitled analysis that is but a rose by another name. *See In re Barrows*, 182 B.R. at 648–49 (Bankruptcy Court for the District of New Hampshire)(making the undue hardship determination by looking "to the individual facts and circumstances surrounding the debtor's financial prospects in the repayment of the student loans," examining attempts to minimize expenses, the budgetary impact of the debtor's discharge, and concentrating its inquiry on whether physical, mental, or financial limitations limit the debtor's future employability). *See also Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett)*, 180 B.R. 358, 362–64 (Bankr.D.N.H.1995)(adopting *In re Brunner* but relying heavily on *In re Barrows*).[16]

The "totality of the circumstances" approach to undue hardship resonates in significant ways with *In re Johnson*'s "mechanical test" and the first two prongs of the *In re Brunner* test, examining the debtor's income history, prospects for earned and unearned income, and expenses, with an eye to determining if the debtor can maintain a household while paying the student loan obligation.[17] As one court has recently commented: "Distilled to its essence, the court must examine the debtor's current income and expenses and determine a 'flexible minimal standard of living' which is sensitive to the particular circumstances of each case through the application of common sense." *See Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr.W.D.Wis.1999) (quoting *Stein v. Bank of New England, N.A. (In re Stein)*, 218 B.R. 281, 287 (Bankr.D.Conn.) in a thoughtful application of *In re Brunner*). The debtor's personal circumstances, such as illness, disability, or the number and needs of dependants, are highly perti-

**16.** Bankruptcy courts elsewhere have embraced this approach, *see Clark v. United Student Aid Funds., Inc. (In re Clark)*, 240 B.R. 758 (Bankr.W.D.Mo.1999)(applying the *In re Andrews* test); *In re Perry*, 239 B.R. at 809 (applying the test as articulated in *In re Andresen*); *Williams v. Missouri Southern State College (In re Williams)*, 233 B.R. 423, 427–28 (Bankr.W.D.Mo.1999)(same); *Ford v. Tennessee Student Assistance Corp. (In re Ford)*, 151 B.R. 135, 138–39 (Bankr.M.D.Tenn.1993)(applying a "totality of the circumstances" approach, listing nine considerations); *In re Johnson*, 121 B.R. at 93–94 (reviewing *In re Johnson*, 5 B.C.D. 532, and finding "that the more equitable approach is to view each case in the totality of the circumstances involved"), or skirted with it. *See In re Lohman*, 79 B.R. at 582 (applying the *In re Johnson* test because the checklist helps with "the gathering and sorting of all the many circumstances to be considered," but noting that "the wisdom of this Court must ultimately lie in seeing beyond the container into its contents"). *See also Law v. The Educational Resources Inst., Inc. (In re Law)*, 159 B.R. 287, 292–93 (Bankr.D.S.D.1993)(adopting a "case-by-case approach that is fact-sensitive to the unique aspects of the case" but considering good faith as sometimes "one of the more significant considerations," and praising the approach for it facilitation of finding an "appropriate, equitable balance" between "concern for cases involving extreme abuse and concern for the overall fresh start policy associated with bankruptcy relief").

**17.** It is also very much like the Commission's articulation of undue hardship. *See supra* note 7.

nent.[18]

### 2. Adopting a Test

■ I conclude that reviewing the "totality of the circumstances" is the best approach to assay "undue hardship" under § 523(a)(8). In doing so, I do not reject the *In re Johnson* and *In re Brunner* approaches outright. They have much in common with the tack I take. But *In re Johnson* and *In re Brunner* test too much.

The problem with applying separate "good faith" and "policy" tests is at least two-fold. First, many of the factors they take into account should, from the start, be incorporated into the totality of the circumstances analysis. To re-apply them as part of separate, second or third stage tests gives them undue emphasis.[19] Second, these second and third stage tests are without textual foundation. Rather than considering how the debtor's education, aptitude, and effort might enable him or her to repay loans without undue hardship, rather than considering how legislative objectives might *inform* the content of the statute's language, courts apply such tests, often in moralistic tones, to *supplement* the legislation. That is, in a word, inappropriate.

My task is to construe and honor the statute's requirement that educational loans will be discharged only if their repayment presents a (post discharge) "undue hardship" for the debtor. To do so requires a principled determination of the requirement's meaning and a careful review of the debtor's circumstances.

If that task is tackled fairly, there is no need to apply separately-constituted "good faith" or "policy" tests. Here is why: Look at *In re Johnson's* "good faith" test. It requires that the debtor show that he or she has made a bona fide repayment attempt. It considers whether the debtor has been "negligent" or "irresponsible" in managing personal finances and securing employment. What does such a test add to an informed totality of the circumstances review? If responsible conduct will alter the debtor's circumstances to render the repayment burden not "undue," why should the court embark on a separate "good faith" inquiry? Analysis of the debtor's pre-bankruptcy repayment efforts and repayment history, an aspect of the *Johnson* test shared with *Brunner*, has historical roots in the time when student loans were automatically rendered dischargeable in bankruptcy when they had been due and unpaid for five, later seven, years. Courts were then concerned that a debtor who chose bankruptcy before five or seven years expired and sought "undue hardship" discharge within that period might not yet have given repayment efforts a chance. That time is past.

■ Whether a debtor files for relief and seeks discharge the day after graduation or ten years later, educational loans will be discharged only on a showing of "undue hardship," a notion that necessarily concentrates on present circumstances and future conduct, not on the past. Of course, this is not to say that the debtor's education, past earnings, and past repayment efforts are utterly irrelevant. They often

---

**18.** In this respect *In re Faish* places the *In re Brunner* form over the Code's substance, stating: "Equitable concerns or other extraneous factors not contemplated by the *Brunner* framework may not be imported into the court's analysis to support a finding of dischargeability." *In re Faish*, 72 F.3d at 306. The Seventh Circuit then (slightly miss) quotes *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) and its statement that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *See*

*Ahlers*, 485 U.S. at 206, 108 S.Ct. 963. However, the Code sets "undue hardship" as the standard: that is the statute's substance. The competing tests are attempts to give structure to this analysis, they are merely forms or "container[s]," as *In re Lohman* reflected. 79 B.R. at 582.

**19.** To take it a step further, if a factor cannot be taken account of in a principled undue hardship assessment, it should not be considered a material factor at all.

provide strong evidence to inform the court's view of how the debtor will fare in the future.

■ The *Johnson* "policy" test is also flawed. The policy adopted by Congress is embodied in the statute's "undue hardship" requirement. Why interpret

and apply the statute's language, the end *product* of legislative policy, only to proceed next to apply a nonstatutory test based on a court's intimation of what more (than what the statute states) that policy means.[20] Of course, such factors as the economic advantage the debtor might reap from his or her education properly inform

---

**20.** Courts taking this route have, in a sense, squared § 523(a)(8)—multiplying it by itself—rather than recognizing that the "undue hardship" provision is, in and of itself, the limit on student loan dischargeability. In doing so, many have relied on sources far less reliable than mill run legislative history.

*In re Johnson* formulated its "good faith" and "policy" tests relying on such things as a letter from the President of the Massachusetts Higher Education Assistance Corporation to a congressman and the remarks at the Bankruptcy Revision Hearing of the attorney for the American Council on Education. *See In re Johnson*, 5 B.C.D. at 540–41, 543. It quoted a congressman's anecdotal statement about law graduate's bankruptcy filing in which student loan constituted 78% of his debt. *See id.* at 543. That anecdote, along with the "rising incidence" language in the Bankruptcy Commission's report, formed the shaky foundation on which the court determined that the percentage of student loan debt in a debtor's schedules is a factor material to § 523(a)(8) dischargeability. *See id.* at 543. *See In re Brunner I*, 46 B.R. at 755–56 (citing *In re Johnson* as the basis for its "good faith" requirement). *See also In re Roberson*, 999 F.2d at 1135–36 (quoting views of "proponents of a higher standard for dischargeability," in concluding that a " 'certainty of hopelessness' " is required to demonstrate debtor's financial straits will persist for a significant stretch of the repayment period, quoting *Briscoe v. Bank of New York (In re Briscoe)*, 16 B.R. 128, 131 (Bankr.S.D.N.Y.1981)).

*In re Lohman*, cited favorably by the First Circuit in *TI Federal Credit Union*, 72 F.3d 921 similarly draws on sources that ought to have no weight in applying the enacted statute. The court excerpts a congressperson's generalized remarks to a House subcommittee purportedly "representing the general consensus." *In re Lohman*, 79 B.R. at 580–81. The court then makes the quite remarkable statement that most courts "agree that the *mood* of Congress indicated that it surely did not intend 'undue' to stand for less than that which is resulting from extenuating circumstances." *Id.* at 581 (emphasis added).

Sure enough, "undue hardship" is an opaque concept, but many courts reach too far trying to clarify it. Legislative interpreta-

tion is a less expansive exercise. As Justice Holmes once observed, "We do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, Jr., *The Theory of Legal Interpretation, in, The Essential Holmes* 296, 299 (Richard A. Posner ed., 1992). *See also In re Hospitality Assocs. of Laurel*, 212 B.R. 188 (Bankr.D.N.H.1997)(discussing interpretation of §§ 503(b) and 726(a)); Gary Klein, *Legislative Intent or Judicial Myth-making?*, Am. Bankr.Inst. J., December/January 2000, at 1 (discussing interpretation of § 1322(b)(2)).

As Justice Field wrote in *Soon Hing v. Crowley*, 113 U.S. 703, 5 S.Ct. 730, 28 L.Ed. 1145 (1885):

And the rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile.

113 U.S. 703, 710–11, 5 S.Ct. 730, 28 L.Ed. 1145 (1885). *See also Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395–96, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)(Jackson, J., concurring)("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared.... [T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions.").

the totality of the circumstances analysis. *See In re Pena*, 155 F.3d at 1114 (value of the debtor's education is not a factor of independent significance but is relevant to the debtor's ability to pay the loan obligation); *see also In re Hornsby*, 144 F.3d at 437 n. 5 (disapproving a policy test that attributes independent significance to assessing benefit of a degree). But such factors as the percentage of student loan debt in the debtor's schedules or the debtor's "motivation" for filing bankruptcy do not. *See In re Bryant*, 72 B.R. at 915 n. 2. ("[A]voiding the consequences of debts is normally the reason for filing for bankruptcy and the fact that the Debtor seeks to discharge almost exclusively student loan obligations in his bankruptcy should be irrelevant.")

### 3. *The Extent of Hardship Required*

In the end, my inquiry into the totality of Kopf's circumstances must come home to roost with the determination of whether she would experience "undue hardship" should the loans be excepted from her discharge.

Many have held that, after applying its chosen test, a court must conclude that the hardship goes beyond the ordinary hardship of a debtor in bankruptcy. *See, e.g., In re Pena*, 155 F.3d at 1111 ("garden variety" hardship not enough); *In re Law*, 159 B.R. at 291 ("Despite its discretionary nature, the interpretation [of undue hardship under a totality of the circumstances approach] does, nonetheless, contemplate the existence of unique and extraordinary circumstances, for the fact that repayment would merely impose a hardship is insufficient"); *In re Ford*, 151 B.R. at 138–40 (describing standards of hardship that go beyond "mere financial hardship or present financial adversity"); *In re Lohman*, 79 B.R. at 584 (debtor's circumstances must be "exceptional and extreme").

Many courts focus on the predicted length of the hardship. *See In re Brunner II*, 831 F.2d at 396 ("Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.' "); *accord In re Barrows*, 182 B.R. at 648; *see also Dresser v. University of Maine (In re Dresser)*, 33 B.R. 63, 65 (Bankr.D.Me.1983) (debtor must demonstrate that for the foreseeable future it would be impossible for him to generate enough income to "pay off" the loan and maintain his household "above the poverty level").[21]

Some courts have held that the hardship must be truly severe and prolonged to warrant discharge. *See Wetzel v. New York State Higher Educ. Servs. Corp. (In re Wetzel)*, 213 B.R. 220, 225 (Bankr. N.D.N.Y.1996)("[T]here must be an extraordinary situation with a certainty of hopelessness as to any possibility of repayment for the indefinite future. Mere inconvenience, austere budget, financial difficulty and inadequate present employment are not grounds for discharging educational debts [for undue hardship]," citations omitted); *In re Mathews*, 166 B.R. at 943, 945 (by using "undue" as a modifier, Congress "meant that ordinary 'garden variety' hardship would not suffice," the debtor "must show that the combination of the low income and exceptional circumstances is so severe and oppressive that there is no way that the debtor will ever be able to repay the debt and maintain a minimal standard of living"); *In re Rappaport*, 16 B.R. at 617 (requiring "total incapacity now and in the future to pay one's debts for reasons not within the control of the individual debtor"). *See also In re Faish*, 72 F.3d at 305–06 (debtor entitled to live in

---

**21.** In an earlier decision Judge Johnson looked for "extraordinary circumstances" hindering the debtor's fresh start as the singular "undue hardship" inquiry. *Nichols v. University of California (In re Nichols)*, 15 B.R. 208, 209 (Bankr.D.Me.1981). He also stated: "Mere inconvenience, an austere budget, financial adversity and a poor, present employment situation are not grounds for including such debts among those discharged in bankruptcy." *Id.* (citing *In re Johnson* among other sources).

something more than "abject poverty," must show "she could not maintain a minimal standard of living if forced to repay her loans" which is a showing of something more than "tight finances").[22]

■ In dictum the First Circuit has suggested only that the "hardship alleged ... must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents." *TI Federal Credit Union*, 72 F.3d at 927.[23]

There are courts, however, that view the requisite hardship as more mundane. Two have recently concluded that the hardship inquiry is whether the debtor has adequate resources to repay the loan and maintain a minimum standard of living. *See In re Peel*, 240 B.R. at 394–95; *In re Salinas*, 240 B.R. at 313 & n. 16 (lamenting that too many courts "discuss 'undue hardship' in the most stringent of terms, focusing not upon whether the debtor possesses an 'adequate' income but rather whether the debtor is scraping by on a 'minimal' standard of living);"[24] *see also Doherty v. United Student Aid Funds, Inc. (In re Doherty)*, 219 B.R. 665, 671 (Bankr. W.D.N.Y.1998) (arguing that *In re Brunner* does not require a "certainty of hopelessness" standard, basing its finding on "the most probable near-future for a debtor").

■ For the most part, I subscribe to the latter view. To conclude that the debtor must demonstrate something approaching a "certainty of hopelessness" or "total incapacity" would be to sacrifice the notion of "fresh start" at the altar of "undue hardship." However, insofar as any of the cases in this category reject the necessity of a fair, fact-based prognostication of the debtor's future circumstances, I part company with them. As mentioned earlier, "undue hardship" is, necessarily, a forward-looking concept.

Taking into account the policy underlying § 523(a)(8) (that is, considering legislative goals to inform the term's content), it is fair to conclude that demonstrating un-

**22.** Courts have interpreted the "undue hardship" requirement of § 523(a)(8) to be something less than the unconscionable standard governing discharge of HEAL Loans. *See, e.g. In re Mathews*, 166 B.R. at 945. The Sixth Circuit compared the terms in *In re Rice*. The court wrote:

Although Congress has not defined the term "unconscionable" as used in § 292f(g), we have little doubt that in using this term it intended to severely restrict the circumstances under which a HEAL loan could be discharged in bankruptcy. We therefore conclude, as have other courts, that in employing the term "unconscionable," Congress intended to adopt the ordinary usage of the term as "excessive, exorbitant," "lying outside the limits of what is reasonable or acceptable," "shockingly unfair, harsh, or unjust," or "outrageous." We find the standard imposed by this definition of "unconscionability" to be significantly more stringent than the "undue hardship" standard established for the discharge of educational loans under § 523(a)(8)(B)....

*In re Rice*, 78 F.3d at 1148–49 (citations omitted).

**23.** The Circuit also remarked that § 523(a)(8) should be taken as an "aberration[ ] from the norm," "depart[ing] significantly from the liberal dischargeability policy manifested in the bankruptcy laws." *TI Federal Credit Union*, 72 F.3d at 937. As the Code is *structured*, that is certainly the case. Section 523(a)(8) provides that such obligations, unlike garden-variety loan obligations, will not be discharged unless the debtor demonstrates undue hardship. But that does not mean that debtors will fail in most attempts to prove undue hardship. Whether or not they succeed is a function of the facts of each case, the totality of the debtor's circumstances, as they measure up against the undue hardship standard.

**24.** In a footnote the court reflected:

This Court questions the wisdom of denying a discharge to a debtor where the debtor's income is insufficient to pay current expenses, and the future seems similarly bleak. As a practical matter, there is little, if any, societal benefit to be gained by such a course of action. The debtor remains unable to pay, and the student loan remains unpaid. Such a draconian result is at odds with not only the fundamental "fresh start" philosophy underlying the entire bankruptcy code, but the history of § 523(a)(8) as well.

due hardship sufficient to obtain student loan discharge requires the debtor to demonstrate that, even with the advantage of a Chapter 7 discharge, her present circumstances and future prospects do not reasonably afford her resources to repay the student loan(s) and provide herself and her dependents with a minimal standard of living. *See In re Salinas*, 240 B.R. at 315–17 (debtor with "frugal lifestyle" living "paycheck to paycheck" entitled to discharge even though he had equity in his home and a relatively high monthly income); *See In re Peel*, 240 B.R. 387 (single healthy chiropractor with a reasonable budget including a $100 reserve had no disposable income to pay student loans).

 From the statutory requirement that a debtor prove "undue hardship" one must infer that some measure of post-bankruptcy hardship may well be due. The character and extent of such hardship as debtors should be expected to endure in consequence of undischarged student loans (*e.g.*, taking on a second job, relocating to a place with improved employment prospects, tightening the budgetary belt), is a case-specific calculation, a function of the totality of the circumstances before the court. *See In re Williams*, 233 B.R. at 427–30 (thorough analysis of joint debtor's income prospects and expense prognosis, concluding that although the debtors' incomes had grown in the past, there were no prospects for further growth that would enable them to support their family and meet all their student loan obligations).

### F. Applying the Totality of the Circumstances "Undue Hardship" Test to Kopf's Circumstances

At best a nettlesome task, my undue hardship determination in this case is all

*Id.* at 313 n. 15.

**25.** After an initial pre-trial conferences, the parties agreed that the best course for the adversary proceeding was to submit the matter to the court on a stipulated record and briefs. Upon review of these submissions the court initiated a further telephonic hearing to address some of the deficiencies and contradictions in the record. Subsequently, and

the more prickly because of gaps and inconsistencies in the spare, stipulated record.[25] Kopf's presentation is hardly tailored to an effective showing under any of the commonly accepted "undue hardship" tests.

### 1. Past, Present, and Future Income

Kopf's current take-home pay, minus taxes, is $306.44 per week. She has worked for a year and a half as an administrative assistant for "Island Music." According to her federal tax returns, in 1998 she earned $17,994 gross income, a sum that includes just under $2000 in unemployment compensation.[26]

Kopf's statement of financial affairs also reveals that in the two years preceding her bankruptcy petition she thrice received unemployment compensation: $1183, $981, and $1500.

On one hand, her average income may be overstated by this calculation because there is no downward adjustment to account for the probability that she earns no paid vacation or sick time. On the other hand, her 1998 tax return reveals a $2265.90 federal tax refund, and her Financial Statement to the Department of Educations reveals a 1998 $298 state tax refund. Her total federal tax liability for 1998 was $325.00, well under what the $33.49 that is deducted from Kopf's weekly wages would aggregate. I conclude that $306.44 per week is an accurate, if not precise, statement of her current income.

With respect to assets, Kopf's February 10, 1999, bankruptcy schedules tell of few, netting $15,415. She scheduled her 1987

with the Department's consent, the debtor filed a supplemental affidavit. Though an evidentiary hearing may have benefitted Kopf, she rested her case on the written submissions.

**26.** The tax filing does not accord with Statement of Financial Affairs which indicates that she earned $10,900 in gross wages from Island Music in 1998.

Toyota Tercel as worth $500; a checking account with a $15.00 balance; $400 in household goods and furnishing; wearing apparel worth an aggregate $300; and a $200 worth of rings. She also schedules $14,000 in child support entitlement (that "entitlement" is not reflected in her schedules as income; it is, presumably, perennially unpaid). Kopf's bankruptcy yielded no distribution to creditors.

The uncontroverted July 1, 1999, financial statement Kopf submitted to the Department indicates that she does not anticipate receiving anything of value from a lawsuit; is not a trustee, executor, or administrator of an estate; is not holding money for another; and expects no inheritance.

### 2. Reasonable Necessary Living Expenses

Kopf's $1262 monthly budget is comprised of reasonable and necessary expenses. She currently pays $326 per month for rent. She lives in subsidized housing and, should her income increase, so too will her rent.

She carries no auto loan, paying $80.00 for transportation expenses and $26.00 per month for auto insurance. Her 1987 Toyota has 170,000 miles on it. Given the age and wear on the car, she anticipates that the time is not far off that she will face additional transportation expenses, yet her budget provides no fund either for repairs or for a new car.

Kopf currently spends $340 per month in daycare expenses for her five-year-old son. (Her 1998 tax return indicates that she paid an average of $227 a month.) She attests that her day care expenses will fall to $302 per month next year when her son begins to attend school, but asserts that this savings will be offset by a $35 per week reduction in income, a consequence

of her anticipated absence from work to take her son to school.

Otherwise, her budget reveals the following monthly expenses: $200 for food, $115 for electricity and fuel, $30 for telephone, $50 for clothing, $25 for laundry, and $30 for "recreation, clubs and entertainment, newspapers, magazines, etc." She has no health insurance, but assigns $40 per month for medical and dental expenses.

On the bare numbers presented (and ignoring the unfunded expenses mentioned above), Kopf's budget is about $66.00 in the black each month.

### 3. Other Circumstances

Kopf has produced no evidence of other circumstance that color, in black or red, her prospects for repaying her student loans. Hers appears to be a household holding steady at two members. Though her bankruptcy schedules revealed substantial medical bills, she offers no evidence of ongoing health problems. She proffers nothing to indicate whether any condition or circumstance (medical, family, social, emotional) impedes her employment prospects. Nor has Kopf provided any information concerning what employment prospects exist for her or are foreclosed. She has submitted no proof anent her job skills beyond the fact that she is putting them to work in retail and that they qualify her as an "administrative assistant."

Though Kopf apparently spent at least two and one half years in undergraduate school, she has said nothing about prospects for completing her education (or why she is incapable of doing so). She has provided no evidence regarding how such education she has attained will aid her or not in bettering her straits.

Simply put, Kopf's proof is geared exclusively toward the here-and-now.[27]

---

**27.** Such data as relates to the future creates as many questions as it answers. For example: Why does Kopf contend that her son's enrolling in full-time school will cause her to

miss five hours of work a week? There is no evidence that bus transportation is unavailable to her or that he suffers some special condition that precludes use of it.

■ This is a close call, but I am constrained to conclude that Kopf has not proved her case. Although her lifestyle is hardly opulent, and there is no room to cut expenses, the budget she has proffered holds a surplus from which a meaningful monthly payment may be made. I cannot say that she is without the ability, if she chooses, to increase her earnings or that some enduring disability, condition or circumstance renders that possibility remote. I cannot say that if Kopf's student loans survive her Chapter 7 discharge she faces undue hardship. The student loans at issue will not be discharged.[28]

### Conclusion

For the reasons set forth above, judgment will enter for the defendants. Ms. Kopf's student loans will not be discharged.

A separate order consistent with this opinion shall enter forthwith.

---

28. I have not been asked to consider fashioning a partial discharge, a point on which the courts are in disagreement. *Compare, e.g., United Student Aid Funds, Inc. v. Taylor (In re Taylor),* 223 B.R. 747, 752–54 (9th Cir. BAP 1998) (concluding that partial discharge is impermissible, reasoning that Congress omitted "to the extent" language from § 532(a)(8), while it included it in subsections (a)(2), (5), and (7)); *with, e.g., In re Brown,* 239 B.R. at 210–11 (identifying no "plain meaning" within § 523(a)(8) vis-a-vis the propriety of partial discharge, the court looked to "congressional intent and the equitable powers of the bankruptcy courts to allow partial discharge"). Nor have I been asked to consider whether the obligations at issue are the product of distinct loans, each of which should be considered dischargeable, or not, separately. *See In re Andresen,* 232 B.R. at 129–37 (reviewing the case law on partial discharge, concluding that the statute "mandates an undue hardship evaluation for each individual educational loan obligation," declaring that a § 523(a)(8)

determination vis-a-vis each loan is "not only allowed, it is required"). I have not considered the former alternative. As to the latter, my conclusion is that, to the extent that separate loans may be involved, excepting their aggregate from discharge has not been proved to impose undue hardship on this debtor.

Finally, I have not been asked to stay such order as I may enter and "revisit" the question of undue hardship at a later time, a practice about which there is some debate. *See Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 360–61 (6th Cir.1994)(rehearing and suggestion for rehearing *en banc* denied)(approving of a stay and revisitation approach, assuming that the bankruptcy court was exercising its § 105 equitable powers). *But see id.* at 361 (dissent disapproving of a revisitation of the loan). Having been asked only to "call it as I see it," I've called it. I will not, *sua sponte,* call "time out" and come back to look again.