**In re Carole Ann LOHMAN, Debtor.**

**Carole Ann LOHMAN, Plaintiff,**

**v.**

**CONNECTICUT STUDENT LOAN FOUNDATION, Defendant.**

**Bankruptcy No. 86–78.**
**Adv. No. 86–46.**

United States Bankruptcy Court,
D. Vermont.

Sept. 25, 1987.

---

A. Biederman, Biederman & Rakow, P.C., Rutland, for Connecticut Student Loan Foundation.

C. Corsones, Corsones & Hansen, Rutland, for debtor/plaintiff.

## MEMORANDUM DECISION[1] DETERMINING DEBT DISCHARGEABILITY

FRANCIS G. CONRAD, Bankruptcy Judge.

This adversary proceeding commenced on the complaint filed by the Chapter 7 debtor to determine the dischargeability of her student loan debts to Connecticut Stu-

---

1. This opinion shall constitute findings of fact and conclusions of law as required by Rules of Bankruptcy Practice and Procedure Rule 7052.

dent Loan Foundation. The matter was tried before the Court on its merits on April 8, 1987.

The sole issue [2] to be determined by us is whether repayment of these loans would impose an undue hardship on this debtor, thereby falling within the provision for discharge of educational loan debts of 11 U.S.C. § 523(a)(8)(B).[3]

In a dischargeability case, the creditor must establish the existence of a debt, that it is owed to or insured or guaranteed by a government agency or a nonprofit institution of higher education, and that it first became due less than five years prior to the date the bankruptcy petition was filed. See *In re Norman,* 25 B.R. 545, 9 BCD 1417 (Bkrtcy.S.D.Cal.1982). No testimony was presented by either party to encourage or discourage a finding for dischargeability on the basis that the loans became due before five years before the filing of debtor's Chapter 7 petition. Having reviewed the record, however, we find that the first payment on the seven loans first became due December 25, 1983, less than five years prior to bankruptcy.[4]

Because we find that debtor/plaintiff failed to sustain her burden of proof [5] that excepting her student loan debts from discharge would cause her un-

due hardship, we rule in favor of the defendant and determine these debts to be nondischargeable in bankruptcy.

The sketch of debtor's financial plight is, sadly, all too familiar in today's Bankruptcy Courts. Debtor is a divorced mother of two children. Testimony reveals that following her 1972 divorce in Connecticut, debtor received little or no maintenance, alimony, or child support from her ex-spouse.

Debtor initially obtained funding in 1976, to further her education, and presumably heighten her future income prospects, enabling her to attend Tunxis Community College. Continuing to fund her education via student loans, she later transferred to Wesleyan University, wherefrom she graduated with a Bachelor's Degree in American History. She aspired to obtain a Master's Degree and a Teaching Certificate, but failed to meet the requirements of the graduate studies and withdrew prematurely from the program in November of 1982.

Debtor testifies that her goal throughout college was to ultimately obtain employment through a Comprehensive Employment Training Act Program, but unfortunately, the program ceased its operation sometime before 1981.

---

**2.** An alternative proviso for dischargeability of educational loan debts, 11 U.S.C. § 523(a)(8)(A), states: A debt is not dischargeable "(8) for an educational loan ... unless—(A) such loan first became due before five years (exhaustive of any applicable suspension of the repayment period) before the date of the filing of the petition ..."

**3.** 11 U.S.C. § 523(a)(8)(B) provides that a debt is not discharged: "(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit of a nonprofit institution of higher education, unless —(B) excepting from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents; ..."

**4.** We calculate debtor's first payment due date on the seven loans to be 12/25/83, relying on Connecticut Student Loan Foundation's "Notice of Default" for failure to make payment within 120 days of due date (noting 4/25/84 as the date 120 days delinquent). We also rely on the seven Truth-in-Lending Disclosures, each bearing debtor's signature, stating that "payment of the note is required on the earlier of the follow-

ing dates: (1) The first day of the thirteenth calendar month after the month in which you complete the course of study for which the loan was made; or (2) the first day of the tenth calendar month after the month in which you cease to carry on at an eligible institution at least one-half the normal academic workload (as determined by the institution)." Debtor's testimony at trial indicates that she terminated her attendance in November, 1982.

We find then, in compliance with the Truth-in-Lending Disclosure Statements, the Notice of Default is accurate. Defendant has met its burden of proof in this proceeding.

**5.** In an 11 U.S.C. § 523(a)(8)(B) dischargeability proceeding, the debtor/plaintiff has the burden of proof by a fair preponderance of the evidence that he/she would suffer an "undue hardship" if the loan were excepted from discharge. See *In re Norman,* 25 BCD 1417 (Bkrtcy.S.D.Cal.1982); *In re Price,* 25 B.R. 256 (Bkrtcy.W.D.Mo.1982); *In re Binder,* 54 B.R. 736, 13 BCD 922 (Bkrtcy.D.N.D.1985).

Placing her life in Connecticut behind her, debtor relocated to Vermont in February, 1983. At that time, she had been employed in Connecticut as a full time assistant buyer for a department store, at a yearly rate of $14,000.00. She left her job and moved to Vermont, of her own volition, without prospect of a new job. Within a month she found full time employment as an assistant to a library curator, at $4.75/hour. She held that position approximately eight months, moving on to another full time position as coordinator of special programs at Castleton State College, at a yearly salary of $14,000.00. She left this position, a position in her chosen field,[6] two weeks later because the hours were longer than she anticipated. From that time, in 1983, to present, she shifted from job to job three times, at pay rates ranging from $3.33/hour to $5.40/hour. Any gaps in her employment were subsidized by ANFC (Aid to Needy Families with Children) or Unemployment Compensation.

Debtor was most recently employed as a full time reservationist for a large Vermont ski area complex. Her gross monthly pay was $864.00. During the pendency of this proceeding, however, this seasonal position was terminated.

Debtor has testified that she is in good health and has no medical disabilities which prevent her from working, and that she is actively looking for new employment. She further testified that in the foreseeable future she cannot see how she can make any payments to Connecticut Student Loan Foundation.

Debtor filed her Chapter 7 petition for relief in bankruptcy on April 22, 1986. She listed thirteen unsecured creditors with debts amounting to approximately $27,000.00. She listed debts to Connecticut Student Loan Foundation/National Account Systems, Inc. for seven student loans obtained between 1978–1981[7] in an aggregate amount of $20,000.00, including interest.[8]

The parties have stipulated as to the validity of the underlying loan documents, they have not, however, agreed on the amount owing on these loans.[9] Debtor asserts that she has made several payments to Connecticut Student Loan Foundation. Defendant disagrees. The disparity involved here appears to be less than a $1,000.00.[10] While we do not make a finding on the exact amount outstanding on these loans, we think it pertinent that this debt in its entirety represents a substantial portion of debtor's listed total indebtedness.[11]

Debtor's listed expenditures total $776.00 per month.[12] There is no indication from

---

6. Debtor testified at trial that her field of endeavor was "social work," despite her academic pursuit of a Bachelor's Degree in American History.

7. The facts show, however, and we find, that debtor obtained her first loan to Connecticut Student Loan Foundation on 09/17/76 and her last loan on 10/04/82 (defendant's Exhibit 1). See footnote 8.

8. The record reveals that Connecticut Student Loan Foundation holds seven guaranteed student loans in the name of borrower, Carole A. Lohman, as recorded on the Repayment Schedule and Disclosure Statement, dated 12/06/83 (defendant's Exhibit 1), in the amounts reproduced below:

    09/17/76 – $1,500.00
    08/26/77 – $1,500.00
    08/16/78 – $2,500.00
    08/15/79 – $2,000.00
    02/10/81 – $2,500.00
    03/04/82 – $5,000.00
    10/04/82 – $2,500.00

9. Defendant's Proof of Claim, filed with this Court on July 23, 1986, indicates an amount owing calculation, of all seven loans, of $20,850.49, including unpaid interest accrued during 120 days of delinquency period and projected accrued interest from 4/25/84 through 7/30/86.

10. The parties agreed at hearing that the disputed amount owing on the student loans would be settled by stipulation following our Decision on their dischargeability.

11. Approximately 75% of debtor's listed total indebtedness is attributable to the seven student loans.

12. See below debtor's weekly expenses as listed on Schedule A, admitted before this Court.

| HOUSE (or living quarters) | $12.00/wk |
| ELECTRICITY | $ 7.00/wk |
| TELEPHONE | $15.00/wk |
| RENT | $58.00/wk |

the record whether her one dependent child, a senior in high school at the time of these proceedings, contributes to or supplements the household coffers. Nor, is there any indication that debtor's dependent child is physically or psychologically disabled, necessitating extraordinary attention and care, and/or extraordinary medical liabilities.[13]

■ A determination of whether a student loan debt falls under the hardship provision of § 523(a)(8)(B) for discharge is discretionary with the Bankruptcy Judge. With this particular statute, Congress left us not to examine the exception to discharge, but rather the premise for discharge. The task is made difficult by both the potential of the statute to forestall the fresh start spirit underlying the more general policy of debt discharge in bankruptcy and by Congress' void of definition of its premise for discharge; the term "undue hardship."

As we would expect, on the larger plane of debt discharge proceedings the statute provides a presumption for discharge in keeping with the fresh start spirit that has pervaded the entire bankruptcy system. In these instances, Congress directs that the statute should be strictly construed against the creditor objecting to discharge and liberally in favor of the debtor.

Section 523(a)(8)(B) of the Bankruptcy Code, however, is quite dissimilar. It excepts student loan debts from discharge unless a resulting imposition of "undue hardship" is predictably evident. In § 523(a)(8)(B) debt discharge proceedings, the presumption swings against discharge, and thereby challenges the fresh start concept of the bankruptcy laws if "undue

hardship" can not be found. The determination of whether a student loan debts falls under the hardship provision of § 523(a)(8)(B) for discharge becomes then, by its nature, a most difficult decision for the Courts.

Because the phrase "undue hardship" is undefined by Congress, Bankruptcy Courts have grappled for a definitive approach to the term for over a decade. Prior to 1976, educational loan debts were not segregated from the more liberal plane of debt dischargeability issues which carried a presumption for discharge. The precursor to 11 U.S.C. § 523(a)(8), § 439A of the Education Amendments of 1976, 20 U.S.C. § 1087-3, was enacted by Congress to curtail an apparent abuse by former students who sought to use bankruptcy as a vehicle to escape their educational loan debts shortly after graduation.

The Commission on the Bankruptcy Laws of the United States was established by Congress in 1970 to study, and make recommendation for revision, the then current bankruptcy laws of the United States. In its 1973 report, it indicated its concern that the incidence of debtors seeking discharge of their student loan debts, through bankruptcy, without any attempt to repay the loans, proposed a threat to the continuance of the educational loan programs.[14] The Commission recommended therefore that in the absence of hardship, educational loans be nondischargeable.[15]

Three years later, in 1976, the testimony of Arkansas Congressman Thornton on the issue, representing the general consensus, offered some perspective before the House

| HOUSEHOLD FURNISHINGS & APPLIANCES (repairs & depreciation) | $ 5.00/wk |
|---|---|
| FOOD | $60.00/wk |
| CLOTHING | $ 8.00/wk |
| LAUNDRY | $ 2.00/wk |
| MEDICAL | $ 8.00/wk |
| ENTERTAINMENT | $ 4.00/wk |
| NEWSPAPERS, BOOKS | $ 3.00/wk |
| BEAUTICIAN | $ 2.00/wk |
| SCHOOL LUNCHES & SUPPLIES | $ 5.00/wk |
| | $194.00/wk |

**13.** The role of debtor's dependent son in these

proceedings is significant only to the extent of our determination of whether debtor's financial burden is heavily weighted by her responsibilities to her son; whether there exists any supplement to her income; and whether there exists any outlook for a reduction in her daily living expenses in the future.

**14.** Report of the Commission on the Bankruptcy Laws of the United States, Pt. I, House Document No. 93–137, 93rd Cong., 1st Sess. (1973) at 176.

**15.** *Ibid.,* at 177.

Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee:

"These low interest loans are made to student borrowers who have no collateral or earnings, on the faith of the student's future earning potential. The student knows this, enters into the arrangement voluntarily on this understanding and, therefore, should not be entitled to relief except in cases of real hardship. Even hardship should usually be a reason for postponement, not for forgiveness."

"It would be a real tragedy for the needy and well-intentioned students who fully intend to repay their loans if abuses of the student loan program such as this undermined public support for the whole program." [16]

In drafting what ultimately became Code § 523(a)(8)(B), it was contemplated that the discharge of student loans on the ground of "undue hardship" would be found only in the rare case based on exceptional circumstances. *See In re Holzer,* 33 B.R. 627, 630 (Bkrtcy.S.D.N.Y.1983), *citing, In re Kohn,* 5 BCD 419, 424, 20 CBC 994, 1006 (Bkrtcy.S.D.N.Y.1979) (quoting statements made at Hearings before the Subcommittee on Improvement in Judicial Machinery of the Committee on the Judiciary of the United States Senate and Hearings before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary (1975–1976)).

Most Courts agree that the mood of Congress indicated that it surely did not intend "undue" to stand for less than that which is resulting from extenuating circumstances.[17] In a very passionate discussion of debtor's economic status, the *Kohn* Court held that:

Congress meant the extinguishment of student loans to be an available remedy to those severely disadvantaged economically as a result of unique factors which are so much a part of the bankrupt's life, present and in the foreseeable future, that the expectation of repayment is virtually non-existent unless by the effort the bankrupt strips himself of all that makes life worth living.

*In re Kohn, id.,* 20 CBC, at 1008.

Exceptional circumstances have been found most frequently as a result of illness, e.g., *In re Norman,* 25 B.R. 545 (Bkrtcy.S.D.Cal.1982); as a result of lack of usable skills, e.g., *In re Seibert,* 10 B.R. 704 (Bkrtcy.S.D.Ohio 1981); the existence of a large number of dependents, e.g., *In re Clay,* 12 B.R. 251 (Bkrtcy.N.D.Iowa 1981); or a combination of these circumstances, *In the Matter of Diaz,* 2 CBC.2d 501, 5 B.R. 253 (Bkrtcy.W.D.N.Y.1980) (debtor was impoverished, partially deaf, with cardiac problems, a former alcoholic, psychiatric inpatient, divorced from her institutionalized husband, with several children, some of whom required psychiatric and dental care). Terming this as a "classic" hardship case, the *Diaz* Court said that to require any payment on the debtor's student loan would unquestionably work an undue hardship on both the debtor and her dependents.

Some Courts, however, have considered a literal meaning of the term "undue." The Court in *In re Moore,* 4 BCD 791, 18 CBC. 2d 646 (Bkrtcy.W.D.N.Y.1978) rejected the creditor's argument that the term "undue hardship" applied only where there were exceptional circumstances, but held instead that "undue" meant inappropriate, or unsuitable, or not right and not extraordinary. *Id.,* 18 CBC.2d, at 648. The *Moore* Court decided in favor of the debtor where she had a Bachelor's Degree in physical

---

**16.** See Hearings before the Subcommittee on Civil and Constitutional Rights on H.R. 31 and H.R. 32, 94th Cong., 1st and 2d Sessions (1975–1976), Pt. 2.

**17.** See *In re Brunner,* 46 B.R. 752 (Bkrtcy.S.D.N.Y.1985); *In re Lezer,* 21 B.R. 783 (Bkrtcy.N.D.N.Y.1982); *Yarber v. Dept. of Health and Welfare,* 19 B.R. 18 (Bkrtcy.S.D.Ohio 1982); *In re Abrams,* 19 B.R. 64 (Bkrtcy.D.Neb.1982); *In re Brown,* 18 B.R. 219 (Bkrtcy.D.Kan.1982); *In re Briscoe,* 16 B.R. 128 (Bkrtcy.S.D.N.Y.1981); *In re Packer,* 9 B.R. 884 (Bkrtcy.D.Mass.1981); *In re Wegfehrt,* 10 B.R. 826 (Bkrtcy.N.D.Ohio 1981); *In re Nichols,* 15 B.R. 208 (Bkrtcy.D.ME. 1981); *Matter of Rappaport,* 16 B.R. 615 (Bkrtcy.D.N.J.1981); *In re Perkins,* 11 B.R. 160 (Bkrtcy.D.VT.1980); *In re Kohn,* 5 BCD 419 (Bkrtcy.S.D.N.Y.1979); *In re White,* 6 B.R. 26 (Bkrtcy.S.D.N.Y.1980); *In re Johnson,* 5 BCD 532 (Bkrtcy.E.D.PA.1979).

education; she had worked at a variety of dead end jobs, but had only been able to work in her chosen field as a substitute teacher for 26 days in the six months prior to her filing of bankruptcy; was single and without dependents; and was not handicapped by poor health; but that her income was at poverty level. The *Moore* Court concluded, without analysis, that debtor had "little chance of obtaining a full time teaching job or any job which would significantly alter her present circumstances in the near future," and noting further that debtor's prospects were "far from rosy." *Id.*, 18 CBC.2d, at 649.

In the most inclusive examination of this issue to date, Bankruptcy Judge Twardowski comments on semantic reliance: "These attempts at a dictionary analysis have resulted in much confusion, a lack of definite standards, and a marked inconsistency in the severity of conditions required by different Courts for establishing a case of 'undue hardship.'" See *In re Johnson*, 5 BCD 532, 536 (Bkrtcy.E.D.PA.1979). Judge Twardowski further directs: "It would seem more accurate, and a more judicially manageable approach, to compare the facts of each case to a checklist of factors which are determinative of whether loan repayment will impose 'undue hardship' on the debtor." *In re Johnson, id.*

We agree that the use of the adjective "undue" must indicate that Congress viewed "garden-variety hardship" as an insufficient excuse for a discharge of student loans. *In re Brunner*, 46 B.R. 752, 753 (D.C.S.D.N.Y.1985). But there is more to glean from the statute. It is our opinion that what can be realized by Congress' equivocation is not only that the Courts must understand that there exists degrees and tenses of "hardship," but that case by case we must weigh this understanding without such strict rule or formula as may narrow our equitable function.

Given the need for some sort of factual weighing station of each particular case, Judge Twardowski's fashioning of a check-

list is most valuable to the gathering and sorting of all the many circumstances to be considered, however, we believe the wisdom of this Court must ultimately lie in seeing beyond the container into its contents.

With this less stringent posture we explore the *Johnson* checklist. The three level test outlined by the *Johnson* Court includes a mechanical test, a good faith test, and a policy test. The mechanical test examines debtor's financial resources and expenses. Specifically, the *Johnson* Court considered past and current financial resources; debtor's expenses; debtor's future employment and income prospects; skills and educational level; and any other factors which relate to his performance in these areas, such as his health, the marketability of his skills, and his responsibility for small dependent children. *In re Kammerud*, 15 B.R. 1 (Bkrtcy.S.D.Ohio 1980).

If an analysis of the facts of a case applied to the mechanical test showed that there is room for sufficient balancing of income and expenses to make payments on the debt, then the debt would be found nondischargeable, for lack of undue hardship. If the mechanical test, however, indicated that the debtor might have difficulty paying the debt, the Court then may move on to the second level test, the good faith test.

The propriety of the good faith test is considered to be emphasized by the generating purpose behind § 523(a)(8): "... to forestall students, who frequently have a large excess of liabilities over assets solely because of their student loans, from abusing the bankruptcy system to shed those loans."[18] Thus, the debtor is required to show that he or she has made good faith efforts to repay the loan and that the forces preventing repayment are truly beyond his or her reasonable control. *In re Rappaport*, 16 B.R. 615, 617 (Bkrtcy.D.N.J.1981).

The *Johnson* Court directs that when assessing the good faith of a debtor's ef-

---

**18.** Report of the Commission on the Bankruptcy Laws of the United States, H.R. No. 93–137, Pt. I, 93rd Cong., 1st Sess. (1973), at 140, n. 14.

forts to repay a student loan, a Court should consider whether the debtor has made a bona fide effort to get a good paying job; whether he has made a true effort to maximize his financial resources; and whether he has been careful to minimize his expenses. *In re Johnson*, 5 BCD 532, 541 (Bkrtcy.E.D.PA.1979). This Court's predecessor, Judge Marro, concurred with the necessity of applying a good faith test saying: "Bankruptcy Courts have uniformly recognized that the purpose of the Bankruptcy Act is to give honest debtors an opportunity to rehabilitate themselves. However, the process of rehabilitation entails the exercise of prudence on the part of the debtor. He must not cast caution to the winds." *In re Ewell*, 1 B.R. 311, 313, 5 BCD 1041 (Bkrtcy. D.VT.1979). The *Brown* Court also concurs: "The Code is intended to protect honest debtors and to facilitate a fresh start, it is not, however, to be used as a shield to hide behind when their hardship is of their own unreasonable, unprudent making." *In re Brown*, 18 B.R. 219, 223 (Bkrtcy.D.Kan. 1982).

Additionally, Courts have looked to restrictions on employability such as sole responsibility for the care of young children, access to transportation, and medical or psychological disability. *See In re Hayman*, 4 BCD 932 (Bkrtcy.S.D.Fla.1978); *In re Ewell, supra.*

If the Court finds that the debtor is in good faith, the debt is then dischargeable. If the Court determines that the debtor is not in good faith, or where the Court finds that the debtor's predicament is self-imposed, a presumption against discharge arises. To rebut this presumption the debtor is required to establish that his purpose in filing the bankruptcy petition was not solely to discharge the student loan debt and that he has not financially benefitted from the education made possible by the loan. *See In re Holzer*, 33 B.R. 627, 631 (Bkrtcy.S.D.N.Y.1983).

In its policy test, the *Johnson* Court looked closely at two factors: (1) whether the dominant purpose of the bankruptcy was to escape liability for the student loan; and, (2) whether the education obtained through the loan had enhanced debtor's earning capability.

These policy factors relate to the abuse of the student loan program which prompted the enactment of the five year bar to discharge found in 20 U.S.C. § 1087-3 (now repealed). *Johnson, id.*, at 542. While few Courts have highlighted a percentage factor of a debtor's student loan debts to his total indebtedness, it is often considered relevant to a determination of whether debtor has filed bankruptcy solely to avoid student loan obligations.

The rationale for judicial scrutiny of the extent to which a student benefits from his education is based on equitable considerations. *In re Johnson, id.*, at 543. Not only is an ex-student whose earnings income has been substantially increased by this education more likely to repay his loan, but he also is more indebted to the lender on a quantum meruit theory. *Id. See also In re Yarber v. Department of Health, Ed. and Welfare*, 19 B.R. 18, 20 (Bkrtcy.S. D.Ohio 1982) (found a controlling factor to be the enhancement of earning capability attributable to education debtor received via the student loans).

In the case at bar, the evidence shows that the debtor is healthy and able to work; is educated beyond the Bachelor's Degree level; and has one dependent, a senior in high school. The striking fact that debtor is presently unemployed, however, does not automatically ensure a finding of "undue" hardship. In a frequently cited discussion, the Court in *Matter of Kohn*, 20 CBC 994, 1007 (Bkrtcy.S.D.N.Y.1979) states:

"But mere financial adversity without more will not do. There must be present such unique circumstances to render it less likely, or likely only with extreme difficulty, or unlikely at all, that a bankrupt will within the foreseeable future be able to honor his commitment."

"It is not sufficient that an employable bankrupt be not at the time of suit employed in the area for which he was trained as a result of the loans now sought to be eliminated. So long as he can be employed in whatever area of

endeavor, the bankrupt will not be heard to complain if the rewards of such position are less than he had hoped for while studying. So long as the potential exists, the bankrupt will not be heard to say that his current income barely keeps life, limb and psyche together, (or his accustomed life style intact), and that no matter how rosy his future, today is difficult."

Calculating the reach of debtor's future earnings is, at best, an imperfected science. Because most debtors seeking discharge of their student loans have only recently completed, or ended, their education, their skills and potential earning power are frequently untested. To undervalue the likelihood of upward progress in work experience and therefore swelled earning potential would be myopic given the overall time frame to be considered. The average length of a term for loan repayment is usually ten years.

This debtor has proven herself to be quite employable. She has, however, had difficulty holding onto any given job, either by choice or otherwise. She has twice given up the prospect of yearly salaries of $14,000.00 (a relatively respectable salary by Vermont standards) to move on to substantially less income in fields unrelated to her aspirations. She testifies that she believes she could/should make $20,000.00 by measure of her skills. Obviously, debtor believes in her earning capabilities. We do not dispute her.

In examining debtor's expenses, many Courts have looked to the propriety of any given expense. We refrain from such activity in this proceeding. While this Court upholds its responsibility to make a determination of whether this debtor's delicate economic scales would be tipped by excepting her debt from discharge, we are without inclination to make specific findings on the appropriateness of debtor's modest life style or recommendations of alternative economic prudence. Clearly, debtor's listed expenses are not of unique or extraordinary nature.

We are more interested, rather, in whether there be any projection of reduced expenses enabling her to carry monthly payments to the defendant. Debtor presented no evidence to indicate that her obligation to provide support for her 18 year old child will continue beyond his high school graduation or that there is no hope of any reduction of her present obligations preventing an allowance to her student loan obligation. There was no testimony or evidence as to what the existing monthly payments are on the loan and for what duration or whether effort was made to mitigate the obligation through extensions or moratoriums on the payments. As such, we have no immediate hint of what monthly amount need be accounted for to satisfy the debt.

We are stalled without more. We cannot find debtor's circumstances to be exceptional or extreme, nor can we find a certainty that repayment of debtor's student loan obligations would prompt an undue hardship. In view of the evidence, Debtor has failed to carry her burden of proof.

Accordingly, we find the debt owed to Connecticut Student Loan Foundation is nondischargeable. A separate Order and Judgment will be entered in accordance with this Memorandum Decision.