In re Pamela ANELLI, Debtor.

Pamela Anelli, Plaintiff,

v.

Sallie Mae Servicing Corporation And Educational Credit Management Corporation, Defendant.

Bankruptcy No. 99–14677–JNF.
Adversary No. 99–1390.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 18, 2000.

Nancy K. McCarthy, Brant Rock, MA, for Plaintiff.

John F. White, Topkins & Bevans, Braintree, MA, for Defendants.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Complaint filed by the Debtor, Pamela Anelli ("Anelli" or the "Debtor"), against the Defendant, Educational Credit Management Corporation ("ECMC" or the "Defendant"), through which she seeks to discharge student loan debt. The issue to be resolved is whether excepting the student loan debt from discharge would impose an undue hardship on the Debtor within the meaning of 11 U.S.C. § 523(a)(8).[1]

The Court conducted a trial on October 24, 2000 at which the Debtor testified and 12 exhibits were accepted into evidence. Pursuant to Fed. R. Bankr.P. 7052, the Court now makes the following findings of fact and conclusions of law.

## II. PROCEDURAL BACKGROUND

The Debtor filed a voluntary petition under Chapter 7 on June 2, 1999. On Schedule A–Real Property, she listed a single family residence located at 238 Lunn's Way, Plymouth Massachusetts, which she valued at $146,200. On Schedule B–Personal Property, the Debtor listed miscellaneous items of personal property, including a "[p]ossible lawsuit pending against Philip Mulvey, Jr., 536 Main Street, Falmouth, MA 02540," which she valued at $5,000. On Schedule C–Property Claimed as Exempt, the Debtor claimed all her property, including the lawsuit and the equity in her residence, as exempt. On Schedule D–Creditors Holding Secured Claims, the Debtor listed Washington Mutual with a first mortgage in the sum of $140,800 on her personal residence and GE

---

1. Section 523(a)(8) provides the following:
 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—...
 (8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]
 11 U.S.C. § 523(a)(8).

Capital Auto Financial as the lessor of a 1998 motor vehicle. On Schedule E–Creditors Holding Unsecured Priority Claims, the Debtor listed the Internal Revenue Service as the holder of a claim in the sum of $5,000 and the Massachusetts Department of Revenue as the holder of a claim in the sum of $1,000. On Schedule F–Creditors Holding Unsecured Nonpriority Claims, the Debtor listed three credit card debts totaling $20,658.24 and medical expenses in the sum of $2,445.00. The Debtor did not list either Sallie Mae Servicing Corporation or ECMC on Schedule F. On Schedule I, the Debtor indicated that she was disabled and received $2,888 in alimony. After the payment of taxes, she indicated that her monthly income was $2,079.36. On Schedule J, she disclosed that her monthly expenses exceeded her income by $367.14.

On July 7, 1999 and October 12, 1999, the Debtor moved to amend Schedule F. The Court granted the Debtor's motions and the Debtor added nine creditors on July 7, 1999, including Sallie Mae, Boston College and Boston University, and 16 creditors on October 12, 1999. The Debtor also amended Schedule B to disclose that the lawsuit, which she valued at $5,000, was against Sears Roebuck & Co. Of the 16 creditors the Debtor added on October 12, 1999, 15 were health care providers.

The Debtor received a discharge on September 8, 1999. Just prior to that date on August 26, 1999, she filed a Complaint against Sallie Mae Servicing Corporation ("Sallie Mae") seeking a discharge of student loan debt on hardship grounds. She alleged in her Complaint that she had received $30,300.00 in student loans of which only $14,271.00 were subsidized by the federal government.

On September 27, 1999, ECMC as assignee of educational loan promissory notes previously held by Sallie Mae, moved the Court to add it as a party defendant. The same day, it filed an Answer and Counterclaim in which it indicated that it lacked sufficient information to either admit or deny the Debtor's allegations. In the Answer and Counterclaim, ECMC, however, contended that the promissory notes evidenced educational loans made to the Debtor under a governmentally funded program. ECMC also asserted two defenses: (1) Debtor's complaint failed to state cause of action against it; and (2) because Debtor has no dependents, the Debtor's request for a hardship discharge had to be denied.

Sallie Mae failed to file an Answer, and the Court defaulted Sallie Mae for failure to answer or otherwise defend the Debtor's Complaint on February 1, 2000. Pursuant to the Court's pretrial order of October 13, 1999, the Debtor and the Defendant submitted their Joint Pretrial Memorandum on February 10, 2000. The Court conducted a trial on October 24, 2000, during which the Debtor testified and the parties stipulated to the admission of 12 exhibits. At the conclusion of the trial, the Court denied the Debtor's motion for directed finding in which she argued that the Defendant failed to submit evidence that the Debtor's student loans were held or subsidized by a government agency. The Court took the issue of whether excepting the student loan debt from discharge would impose an undue hardship on the Debtor under advisement. Both parties filed briefs on October 24, 2000.

## III. FINDINGS OF FACT

Pamela Anelli is a 45 year old woman with no dependents. In March of 1997, she and her husband of 20 years were divorced. Pursuant to the divorce settlement, Anelli and her husband divided the proceeds from his 401(k) retirement plan

and her IRA equally. Her tax returns for 1997 and 1998 showed the division of marital property from the divorce and that she grossed $117,295 and $73,988 in 1997 and 1998, respectively. At trial, the Debtor testified that she spent all of the proceeds from the division of the couple's retirement savings, using some of the funds to purchase her home in Plymouth, Massachusetts and the remainder on living expenses and attorneys' fees incurred as a result of the divorce proceedings.

Anelli received a BA in human services from Lesley College in 1995. After graduation, she pursued a Masters Degree at Boston College Graduate School. Anelli dropped out of the graduate program sometime in 1997 during the divorce proceedings.

To finance her college and graduate school education, she obtained Federal Stafford student loans evidenced by five promissory notes now held by ECMC. (*See* Defendant's Exhibits 1–5). The Debtor borrowed approximately $30,000 from the Defendant. Due to the accrual of interest, the Debtor now owes in excess of $40,000.

On cross-examination, the Debtor testified that she did not want to drop out of the graduate program, but rather "had to drop out." (Transcript at 23). She explained that she was unable to complete her education because of her medical circumstances, including an operation to remove tumors. (*See* Transcript at 34; Plaintiff's Proposed Finding of Fact and Law at 3). She also stated that at the time she incurred student loan debt, her husband was earning approximately $90,000 per year. At trial, she claimed to have made payments totaling $800 toward her student loan obligations since leaving graduate school. (Transcript at 39).

Prior to trial, the parties stipulated to the admissibility of exhibits several of which document the Debtor's past and recent health. (*See* Joint Pretrial Memorandum at 3). A summary of the exhibits reveals the following:

(1) At least one doctor, Dr. Ramon Espinosa, certified that the Debtor is totally and permanently disabled;

(2) According to her doctors, the Debtor suffers from fibromyalgia, chronic fatigue syndrome, hypothyroidism, asthma, depression, headaches, borderline hypertension, and osteoarthritis. Dr. Goldenberg, with whom the Debtor meets annually, noted at one point that the Debtor was taking at times up to 12 or 14 Advil per day;

(3) The Debtor takes several medications for chronic pain and depression;

(4) The prognosis for regaining her health is poor; and

(5) According to a police department incident report, dated February 7, 2000, the Debtor allegedly attempted suicide by taking an overdose of drugs while driving her vehicle.

According to the Debtor, several disabilities prevent her from seeking and obtaining employment, and thus paying her outstanding student loan debt. In addition to the exhibits submitted at trial, to which ECMC did not object, the Debtor testified that she had surgery scheduled for October 30, 2000 to remove two large abdominal tumors. She indicated that she had had surgery to remove a tumor from her knee in 1995.[2]

The Debtor indicated that her lack of concentration, mood swings and her need for constant medication as a result of her medical conditions affected her ability to work. She suggested that her failure to take antidepressant medication for a peri-

---

**2.** At trial, the Debtor did not explain the cause of her tumors.

od of time precipitated a suicide attempt. Fibromyalgia, in particular, causes her muscles to become tender and painful to the touch, a condition which at times prevents her from even getting out of bed. She can, however, control some of the symptoms of fibromyalgia with over the counter drugs. She also testified that she experiences pain and discomfort from arthritis. In addition, she indicated that Chronic Fatigue Syndrome leaves her without energy and causes her to be tired regardless of the number of hours she sleeps. She also claimed that she has asthma, although she is not currently being treated for it and no longer uses inhalers. According to her testimony, her doctors have indicated to her that her medical conditions are permanent.[3]

The Debtor has no medical insurance. Medical insurance coverage paid by her former husband, presumably as a condition of the divorce settlement, ended in January of 2000. The Debtor investigated other health insurance plans but found that the cheapest one cost approximately $188 per month, an expense which she cannot afford. She does, however, receive some medication at no cost. Nevertheless, she explained that she would be responsible for payment of her upcoming surgery, for which the hospital would establish some kind of repayment plan to accommodate her financial condition.

Today, the Debtor's sole source of income is $2,888 in alimony. The Debtor stated that she had had a part time job "Mystery Shopping,"[4] which she characterized as a "hobby." She admitted that she had not tried to obtain any regular full or part-time work. (Transcript at 23–24).

As of the date of trial, she had only earned $12 in income from "Mystery Shopping."

The Debtor claimed to have sought help with her resume from Massachusetts Resources. She indicated that she has been unsuccessful in her attempts to obtain employment. She admitted, however, that she had not gone to any government agencies for assistance in finding a job, especially those which may provide listings for jobs which might accommodate her medical condition.

The Debtor testified that she has only a small amount of equity in her house. She valued the house at $146,000 and indicated that it is encumbered by a $145,000 mortgage. On cross-examination, however, the Debtor admitted that only two years prior to her bankruptcy she purchased the house for $171,000.

On her bankruptcy schedules, the Debtor listed a checking and savings account in which she had a total of $40 in cash on hand; household goods and furnishings valued at $600; wearing apparel valued at $100; and furs and miscellaneous jewelry valued at $1,200. The Debtor also testified at trial that she had a pending action against Sears arising from a slip and fall accident. She incorrectly listed this action on Schedule B as a "[p]ossible lawsuit pending against Philip Mulvey, Jr." The case has not settled although the Debtor at one point demanded $15,000 to settle the case. The Debtor told the Court that her attorney did not think "that much will happen" with the Sears case.[5]

Comparing Schedules I and J, the Debtor's expenses exceed her income ($2,079.36

---

**3.** The attorney for ECMC did not object to or move to strike this testimony.

**4.** "Mystery shopping" entails scouting various banks, reviewing the conduct of bank employees and writing up a report for the banks.

**5.** Counsel to ECMC do not object to or move to strike this testimony.

in income versus $2,446.50 in expenses, including a $115 for the repayment of her student loans). At the date of her petition, her monthly expenses included $800 for her mortgage, $334 for utilities, $322.50 for food, $100 for medical expenses, $55 for transportation, $46 for homeowner's insurance and $132 for auto insurance. The Debtor leases a vehicle, a 1998 Isuzu Rodeo, for $330 per month. When asked by opposing counsel whether she could have leased a cheaper vehicle, the Debtor responded that other "places wouldn't give [her] the loan." (Transcript at 19). Her vehicle lease ends sometime in 2001, and she does not anticipate being able to purchase the vehicle at that time.

At trial, the Debtor testified that her mortgage payments have increased to $950 per month and several utility bills (trash, water) have increased while only one has decreased (telephone). The Debtor attributed the most significant increase in her current expenses to her medical problems. She testified that her tumor surgery alone would cost close to $7,000, not including post-operative expenses, and that she already owes $1,000 for past medical bills. In addition to her medical expenses, the Debtor testified that she owes the Internal Revenue Service approximately $17,000 and the Massachusetts Department of Revenue approximately $4,000 for the tax years 1997—1999. She stated on cross-examination that given her financial situation there is no amount that she could possibly pay on her student loan debt.

## IV. POSITIONS OF THE PARTIES

### A. *The Debtor*

The Debtor argues that excepting her student loan debt from discharge would cause her an undue hardship triggering the exception to the discharge exception under 11 U.S.C. § 523(a)(8). Specifically, she contends that her medical condition prevents her from obtaining and maintaining employment, citing the opinions of her doctors, which are that her prognosis for future recovery is poor. The Debtor also emphasizes that she has no health insurance to meet expected medical expenses. Moreover, as her monthly living expenses have on average increased, she is totally dependent on the fixed alimony payment she receives from her ex-husband. The Debtor argues that under the totality of the circumstances test for hardship announced in *Kopf v. U.S. Dept. of Educ.*, 245 B.R. 731 (Bankr.D.Me.2000), her student loans are dischargeable.

### B. *The Defendant*

The Defendant asks the Court to deny the relief sought by the Debtor. In support of its case, it argues that the Debtor, bearing the burden of proof, cannot demonstrate undue hardship or establish that unique and extraordinary circumstances exist that would warrant discharge of her student loan debt. In particular, the Defendant contends that the Debtor fails the test articulated by the court in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2d Cir.1987), because (1) the Debtor could maintain a "minimal" standard of living even if she were forced to repay the loans; (2) there is no credible evidence to suggest that the Debtor's situation will not improve over the repayment period; and (3) the Debtor has failed to make a good faith efforts to repay her student loans.

## V. DISCUSSION

 As a preliminary matter, the Court rejects the Debtor's argument that the student loans at issue are not within the purview of § 523(a)(8). The Court finds that the plain meaning of § 523(a)(8) requires that the applicable loans be "made under any program funded in whole

or in part by a governmental unit. . . . ," not that the loans themselves be subsidized by the governmental unit as suggested by the Debtor. 11 U.S.C. § 523(a)(8). The Court concludes that the promissory notes submitted by the Defendant (Defendant's Exhibits 1–5) establish that loans were made under the auspices of a federally funded program, namely, the Federal Stafford Loan Program. Accordingly, § 523(a)(8) is applicable. Because the parties have already stipulated that the notes were signed by the Debtor and the proceeds were used for her educational benefit, the only issue which remains for the Court's determination is whether the repayment of the loans would impose an undue hardship on the Debtor within the meaning of § 523(a)(8) if the Court were to except the student loan debt from discharge. The Debtor bears the burden of proving that she is entitled to a hardship discharge of her student loans by a preponderance of the evidence. *See Kopf,* 245 B.R. at 734; *cf. Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In determining hardship, courts have applied several tests. The court in *Kopf* described these tests in detail. In *Pennsylvania Higher Educ. Assistance Agency v. Johnson (In re Johnson),* 5 B.C.D. 532 (Bankr.E.D.Pa.1979), the "court articulated a 'mechanical test' for 'undue hardship,' employing a 'checklist of factors' against which to compare the facts of each case." *Kopf,* 245 B.R. at 737(citing *Johnson,* 5 B.C.D. at 536 and 539). In addition to factors such as wages, skills, education and ability to obtain or retain employment, as well as "what expenses would be necessary for a hypothetical debtor in a similar situation," 245 B.R. at 737, the *Johnson* test requires a court to inquire about the debtor's "good faith" and the "policy" behind § 523(a)(8). To satisfy the "good faith test," a debtor must demonstrate that she

has made a " 'bona fide attempt to repay the loan.' " 245 B.R. at 738 (quoting *Johnson,* 5 B.C.D. at 540). "If the debtor is not 'negligent or irresponsible in [her] efforts to minimize expenses, maximize resources, or secure employment,' she passes the good faith test and discharge of the student loans is in order." 245 B.R. at 738 (quoting *Johnson,* 5 B.C.D. at 544). Under the policy test, a court may consider whether "the dominant purpose of the bankruptcy petition was to discharge the student debt" or "the debtor has definitely benefit[t]ed financially from the education which the loan helped to finance." 245 B.R. at 738 (quoting *Johnson,* 5 B.C.D. at 544).

The often quoted *Brunner* test, articulated by the Second Circuit, provides that a student loan will be discharged for undue hardship if the debtor establishes the following:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396. The Third, Seventh and Ninth Circuits, as well as the Bankruptcy Court for the District of New Hampshire, have all adopted the *Brunner* test. *See Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298 (3d Cir.1995); *In re Roberson,* 999 F.2d 1132 (7th Cir.1993); *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1111–12 (9th Cir.1998); *Garrett v. N.H. Higher Educ. Assistance Found.,* 180 B.R. 358, 362 (Bankr.D.N.H. 1995).

Several bankruptcy courts, including at least two in this circuit, have followed the "totality of the circumstances" test. Although this test is similar to those employed in *Johnson* and *Brunner*, it discounts the significance of the "good faith" and "policy" inquiries of those tests. *See Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 139 (8th Cir. BAP 1999)(concluding that the Eighth Circuit had already expressed its preference for a totality of the circumstances test); *Kopf*, 245 B.R. at 741; *Phelps v. Sallie Mae Loan Serv. Center (In re Phelps)*, 237 B.R. 527, 535 (Bankr. D.R.I.1999). Under the totality of the circumstances test, the court must examine the debtor's current income and expenses as well as prospects for earned and unearned income to "determine if the debtor can maintain a household while paying the student loan obligation." *Kopf*, 245 B.R. at 740.

■■■ Given the circumstances of this case, the Court finds it unnecessary to belabor the merits of each test. Neither the plain language of § 523(a)(8) nor the First Circuit mandate one particular test. Moreover, this Court observes that while courts purport to apply different tests they essentially look to the same factors. Therefore, without accepting one test at the exclusion of the others, the Court adopts the totality of the circumstances approach and will consider several factors placing no undue emphasis on any one of them in determining "undue hardship." Although not an exclusive list, the Court considers relevant, but not necessarily dispositive of the issue, the following:

(1) whether the Debtor could meet necessary living expenses for herself if forced to repay the loans;[6]
(2) whether the Debtor has made good faith efforts to repay the loan;
(3) whether the Debtor filed for bankruptcy for the sole reason of discharging student loan debt;
(4) whether additional facts and circumstances such as a medical condition, employability and the like weigh in favor of a hardship discharge.

■■■ In considering these and other factors, the Court acknowledges that the First Circuit has suggested, though in dictum, that the "hardship alleged ... must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents." *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 927 (1st Cir.1995); *see also Lohman v. Connecticut Student Loan Found. (In re Lohman)*, 79 B.R. 576, 581 (Bankr.D.Vt.1987) (holding hardship is discovered in "the rare case based on exceptional circumstances"). At the same time, the Court must balance the general policy of preventing the discharge of student loan debts against a fundamental bankruptcy principle of providing the honest debtor with a "fresh start." *See Kopf*, 245 B.R. at 744. Accordingly, the Court does not interpret this hardship standard to require a "certainty of hopelessness," *Wetzel v. New York State Higher Educ. Servc. Corp. (In re Wetzel)*, 213 B.R. 220, 225 (Bankr.N.D.N.Y.1996). *See Kopf*, 245 B.R. at 744; *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr.W.D.Wis.1999) ("To suggest that the court's role as finder of fact is to ascertain the 'certainty' of the future

6. In one of the few published Massachusetts cases involving hardship, the court examined the debtor's ability to minimize expenses as a factor to be considered under § 523(a)(8). *See Massachusetts Higher Educ. Assistance Corp. v. Packer (In re Packer)*, 9 B.R. 884, 887 (Bankr.D.Mass.1981).

is to set an impossible task before those with imperfect vision."); *Ammirati v. Nellie Mae, Inc. (In re Ammirati),* 187 B.R. 902, 906 (D.S.C.1995) (holding that "minimal standard of living" under *Brunner* test does not equate to poverty-level income). Conversely, the Court recognizes that undue hardship requires more than the usual "garden variety" hardship. *Pena,* 155 F.3d at 1111 (citing *In re Brunner,* 46 B.R. 752, 753 (S.D.N.Y., 1985), *aff'd* 831 F.2d 395 (2d Cir.1987)); *see also Jones v. National Payment Center (In re Jones),* 242 B.R. 321, 325 (Bankr.E.D.Va.1998) (finding undue hardship means "more than 'unpleasantness' associated with repayment of a just debt").

 Applying the law to the facts in this case, the Court concludes that under the circumstances, requiring the Debtor to repay her student loans would impose an undue hardship upon her.[7] In concluding that the Debtor's student loan debts are dischargeable, the Court finds that the Debtor's unrebutted testimony and evidence regarding her medical conditions are sufficient to sustain her burden of proof. By stipulating to the various medical letters and records introduced into evidence by the Debtor at trial and by failing to offer medical evidence or testimony of its own, the Defendant all but conceded the point that the Debtor is medically disabled from finding or obtaining employment that would enable her to repay her student loans. The Court finds that the Debtor's disability constitutes the type of circumstance which would pass muster under any of the tests for undue hardship.

Given the Debtor's numerous medical ailments, including Chronic Fatigue Syndrome, arthritis, fibromyalgia, a particularly debilitating condition, and depression, the Court finds that it is unlikely that the Debtor will be unable to find and keep full-time or significant part-time employment from which to generate a steady stream of income. This conclusion is compelled by the Total and Permanent Disability Cancellation Request ("Request") which was completed in November of 1999 by Dr. Ramon Espinosa, one of the Debtor's doctors. Dr. Espinosa certified that the Debtor is totally and permanently disabled as a result of her current health impairments.[8]

At 45 years of age, the Debtor would have a 20 year expectancy in which to repay over $30,000 in student loan debt to the Defendant while attempting to provide for necessary living expenses on a fixed income. As of the petition date, the Debtor had no excess disposable income, and her sole source of income was and remains the alimony payments by her ex-husband pursuant to their divorce settlement, unadjusted for the rising costs she faces. Evaluating the Debtor's schedules and testimo-

---

7. The Court finds it unnecessary to address in detail the issue of whether a § 523(a)(8) discharge could apply to a portion of the student loans as the parties neither raised nor argued the issue at trial. Several courts, however, have stated that general equitable powers granted to the courts give them discretion to discharge a portion of the debt while leaving the remaining amount non-dischargeable. *See, e.g., Jones v. Nat'l Payment Center (In re Jones),* 242 B.R. 321, 326 (Bankr.E.D.Va. 1998).

8. The Request which contains Dr. Espinosa's signature provides in pertinent part:

SECTION 3: PHYSICIAN'S CERTIFICATION
. . .
I certify in my best professional judgement, the borrower identified above is unable to work and earn money or go to school because of an injury or illness that is expected to continue indefinitely or result in death. I understand that any borrower able currently or in the future to work and earn money or go to school, *even on a limited basis,* is not considered to have a Total and Permanent Disability . . . .
Plaintiff's Exhibit 6 (emphasis added).

ny regarding her financial situation, the Court finds that none of the Debtor's expenses appear to be so extravagant as to warrant the conclusion that the Debtor could repay the student loan debt if she reduced her expenses.

Additionally, the Court finds that the Debtor has made a bona fide attempt to repay the loan, making payments of approximately $800 during a six month period between the date the loans first became due and the bankruptcy petition date. Furthermore, the Defendant produced no evidence, nor did it argue, that the Debtor filed bankruptcy in bad faith, i.e., for the sole purpose of discharging student loan debt. In reviewing the Debtor's bankruptcy schedules, the Court finds that the Debtor had substantial debts for taxes, medical services and credit cards, all of which likely would have factored into her decision to file for bankruptcy relief.

The Defendant highlighted several facts which suggest that the Debtor might be able to repay the student loans. For example, it points to the Debtor's expenditure of a substantial sum of money from her divorce settlement in the course of two years. Moreover, the Defendant questions the Debtor's decision to purchase and remain in her Plymouth home because she could conceivably find a smaller home or rental property in which to live. Finally, it questions why the Debtor has not sought additional governmental or local programs to assist her in finding employment suited to her unique disabilities. In short, the Defendant raises the issue of whether these considerations militate against a finding of undue hardship given the Debtor's current and prospective circumstances. The Court finds that these considerations do not sufficiently undermine the proof offered by the Debtor that excepting the student loan debt from discharge would impose an undue hardship on her.

## VI. CONCLUSION

For the foregoing reasons, the Court finds that excepting the student loan debts from discharge would impose an undue hardship on the Debtor. Accordingly, the Court orders that the student loan debt is discharged pursuant to 11 U.S.C. § 523(a)(8).

### ORDER

In accordance with the Memorandum dated December 18, 2000, the Court finds that excepting the student loan debts owed to Educational Credit Management Corporation from discharge under 11 U.S.C. § 523(a)(8) would impose an undue hardship on the Debtor, Pamela Anelli. Accordingly, the Court enters judgment in favor of the Plaintiff/Debtor and against the Defendant.