In re Jean M. BURKHEAD, Debtor.

Jean M. Burkhead, Plaintiff,

v.

United States of America and Educational Credit Management Corporation, Defendant

Bankruptcy No. 02–10191–JNF.
Adversary No. 02–1209.

United States Bankruptcy Court, D. Massachusetts.

Feb. 3, 2004.

Michael Kalis, Esq., Dedham, MA, for Plaintiff/Debtor.

John F. White, Esq., Topkins & Bevans, Braintree, MA, for Defendant/Educational Credit Management Corp.

## MEMORANDUM

JOAN N. FEENEY, Chief Judge.

### I. INTRODUCTION

The matter before the Court is the Complaint filed by the Jean M. Burkhead (the "Plaintiff" or the "Debtor") pursuant to which she seeks a determination that her student loan debt is dischargeable under 11 U.S.C. § 523(a)(8) on the ground that its repayment will impose an undue hardship upon her. Educational Management Corporation ("EMC") answered the Complaint, and the Court conducted a trial on November 24, 2003. At the trial, only the Debtor testified and twenty exhibits were accepted in evidence.

The issue presented is whether the Debtor sustained her burden of establishing that excepting the debt from discharge will impose an undue hardship upon her. For the reasons set forth below, the Court concludes that the Debtor failed to sustain her burden of proof and that her student loan debt should not be discharged. The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

### II. FACTS

The Debtor filed a voluntary Chapter 7 petition on January 9, 2002. She listed only student loan debt and credit card debt on her schedules of liabilities. The Chapter 7 Trustee filed a Report of No Distribution on February 12, 2002, and the Debtor received a discharge of her credit card debt approximately three months later on April 25, 2002.[1] The Debtor filed a Complaint against the United States of America and Sallie Mae Servicing Corporation on June 10, 2002. EMC is the present holder of the claim against the Debtor for unpaid student loans.[2]

At the commencement of the trial, counsel to the Debtor represented that he "took the case and went forward on a *pro bono* basis." In view of counsel's Rule 2016(b) Statement, filed on January 9, 2002, in which he represented that the Debtor had paid him $1,300 prior to filing the Statement, the Court concludes that counsel to the Debtor misspoke and was referring to the adversary proceeding when he stated he was representing the Debtor *pro bono*.[3]

The Debtor is a 34 year old, single woman with no dependents. She is a 1995 graduate of Northeastern University. She

---

1. The discharge under 11 U.S.C. § 727 did not discharge the Debtor "from any debt ... for an educational ... loan made, insured, or guaranteed by a governmental unit...." 11 U.S.C. § 523(a)(8).

2. The Court substituted EMC as a defendant in place of Sallie Mae Servicing Corporation, which had transferred or assigned the Plaintiff's educational loans to American Student Assistance, which, in turn, transferred or assigned them to EMC. The United States of America filed an answer in which it stated that it would be bound by the Court's determination in the event that the loans are later assigned to the Department of Education.

3. The Court takes judicial notice of the pleadings on file in the Debtor's case.

enrolled in a five-year program in 1987 to obtain an accounting degree, but, because of medical problems, required eight years to complete her course work. Nevertheless, she graduated with honors. She appeared healthy at the time of trial, and her testimony and demeanor demonstrated that she is both articulate and well organized.

The Debtor has experienced serious medical problems since early 1987 when she was a student at Northeastern. She has a long and extremely complicated medical and surgical history, which includes two major surgical procedures to remove ovarian cysts, as well as other laparoscopic procedures and tests relating to her medical diagnosis of endometriosis. The Debtor submitted medical records from numerous doctors and medical professionals and a twenty-four page summary of her medical history, in which she included a detailed recitation of all her surgical procedures, diagnostic tests, physician appointments, and physical therapy and pain clinic sessions. Additionally, the Debtor included in her medical history the pain levels she experienced, her symptoms, and medications.

The Debtor testified that she regularly experiences pain and nausea and is limited in her physical activity. She stated that she could not work more than 14 to 20 hours per week, as six hours of activity per day is too much for her. She also indicated that she has difficulty sleeping through the night and that the medications she takes sometimes make her drowsy. She stated she has strong negative reactions to the smell of coffee and perfume.

Despite the Debtor's debilitating condition, as her medical records reveal, her symptoms are amenable to treatment and control. At the trial, the Debtor submitted several documents containing statements of her treating physicians. Elizabeth A. Stewart, M.D., an Assistant Professor at the Harvard Medical School and the Clinical Director of the Center for Uterine Fibroids at the Brigham and Women's Hospital, stated in a letter dated January 14, 2002 that on her present medications, "she has been much more stable,"[4] and a physician at the Pain Management Center reported that in June of 2003, the Debtor stated to him that "her pain is under pretty decent control" and that "occasionally she has exacerbations however for the most part it [the pain] is under control."

The Debtor works part time for an attorney as a bookkeeper/accountant. She now earns approximately $1,020 per month, which after taxes leaves her with a net monthly income of $796.72. Her expenses exceed her income by approximately $500 per month. The Debtor was not asked and, therefore, did not explain whether she borrowed, saved or was given the $1,300 used to pay her counsel to prepare her Chapter 13 petition.

The Debtor estimated that she would earn approximately $11,500 in the year 2003, although in 2000 and 2002, she earned $13,248 and $13,9644, respectively. The Debtor testified that she was unable to afford nutritional supplements, vitamins, organic foods, and chiropractic treatments, all of which she stated help her condition.

The Debtor has seven loans outstanding, having borrowed a total of $24,551 under the Stafford Loan Program to finance her education. She made one payment on these loans in the sum of $121 on January 21, 1996. The Debtor, however, with the

---

**4.** Dr. Stewart wrote an identical letter on November 21, 2001 addressed to "To Whom It May Concern."

assistance of her mother, repaid in full a federal Perkins Loan in the sum of $2,900. At times, the Debtor was able to make monthly payments on that loan in the sum of $30.76. The Debtor submitted exhibits containing detailed summaries of the distribution dates of the loan proceeds, payments and, in the case of the Stafford loans, the time periods for deferrals and forbearances. EMC is now owed $38,368.48.

EMC submitted, as Defendant's Exhibit 3, a letter to Debtor's counsel dated May 20, 2003, in which EMC's counsel outlined four repayment options under the William D. Ford Federal Direct Loan Program. The letter provided:

> The fourth type of repayment plan is the Income Contingent Repayment ("ICR") Plan. It is probably the most popular repayment option. The amount of the monthly payment under the income Contingency Repayment Plan is calculated based upon the borrower's annual income, the total amount borrowed, and family size. The monthly amount is calculated as (a) the amount that would be paid if the borrower repaid the loans in 12 years, multiplied by an annual income percentage factor that varies based upon the borrower's annual income; or (b) 20% of the borrower's discretionary income, which is defined as the borrower's adjusted gross income minus the poverty level for the borrower's family size. If that calculation yields a monthly payment between zero and $5.00, the monthly payment is $5.00, unless the borrower's income is less than or equal to poverty level, *in which case the monthly payment is zero.* If the monthly payment is less than the amount of the interest that accrues on the loans, the interest is capitalized, i.e. added to the principal, once a year until the principal balance reaches 10% more than the original principal balance. At

that point, interest continues to accrue but is not added to the principal balance. Given Ms. Burkhead's estimated 2002 adjusted income of $13,920.00 payments would initially be $88.83 per month. The repayment period for Ms. Burkhead would be twenty-five years (300 months). As noted, the payments would be adjusted annually and the payments would decrease in amount in the event Ms. Burkhead experienced a reduction of income in the future.

On cross-examination, counsel to EMC asked the Debtor if she had considered loan consolidation under the William D. Ford Federal Direct Loan Program. The Debtor responded that she knew the program was available but did not apply for it because "even the monthly payments they offered were way too high, unfortunately."

## III. DISCUSSION

 The Debtor, because she is seeking to discharge her student loan debt on the ground of undue hardship, bears the burden of proof by a preponderance of the evidence. *Pace v. Ed. Credit Mgmt. Corp. (In re Pace)*, 288 B.R. 788, 792 (Bankr. S.D.Ohio 2003). This Court has determined that to satisfy her burden she must demonstrate that the "totality of the circumstances" warrants discharge of the student loan debt. *See Anelli v. Sallie Mae Serv. Corp. (In re Anelli)*, 262 B.R. 1 (Bankr.D.Mass.2000). *See also Long v. Ed. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554–55 (8th Cir.2003); *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981).

 In *Anelli*, this Court considered various tests which bankruptcy and appellate courts have formulated to assist in determining what constitutes an "undue hardship." It stated the following:

[T]he Court finds it unnecessary to belabor the merits of each test. Neither the plain language of § 523(a)(8) nor the First Circuit mandate one particular test. Moreover, this Court observes that while courts purport to apply different tests they essentially look to the same factors. Therefore, without accepting one test at the exclusion of the others, the Court adopts the totality of the circumstances approach and will consider several factors placing no undue emphasis on any one of them in determining "undue hardship." Although not an exclusive list, the Court considers relevant, but not necessarily dispositive of the issue, the following:

> (1) whether the Debtor could meet necessary living expenses for herself if forced to repay the loans;
>
> (2) whether the Debtor has made good faith efforts to repay the loan;
>
> (3) whether the Debtor filed for bankruptcy for the sole reason of discharging student loan debt;
>
> (4) whether additional facts and circumstances such as a medical condition, employability and the like weigh in favor of a hardship discharge.

*Anelli*, 262 B.R. at 8. This Court added:

> In considering these and other factors, the Court acknowledges that the First Circuit has suggested, though in dictum, that the "hardship alleged ... must be undue and attributable to truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents." *TI Federal Credit Union v. DelBonis*, 72 F.3d 921, 927 (1st Cir.1995); *see also Lohman v. Connecticut Student Loan Found. (In re Lohman)*, 79 B.R. 576, 581 (Bankr.D.Vt. 1987) (holding hardship is discovered in "the rare case based on exceptional circumstances"). At the same time, the Court must balance the general policy of preventing the discharge of student loan debts against a fundamental bankruptcy principle of providing the honest debtor with a "fresh start." *See Kopff v. Dept. of Educ.]*, 245 B.R. [731] at 744 [(Bankr. D.Me.2000)]. Accordingly, the Court does not interpret this hardship standard to require a "certainty of hopelessness," *Wetzel v. New York State Higher Educ. Servc. Corp. (In re Wetzel)*, 213 B.R. 220, 225 (Bankr.N.D.N.Y.1996). *See Kopf*, 245 B.R. at 744; *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 314 (Bankr. W.D.Wis.1999) ("To suggest that the court's role as finder of fact is to ascertain the 'certainty' of the future is to set an impossible task before those with imperfect vision."); *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 906 (D.S.C.1995) (holding that "minimal standard of living" under *Brunner* test does not equate to poverty-level income). Conversely, the Court recognizes that undue hardship requires more than the usual "garden variety" hardship. *[United Student Aid Funds, Inc., v.] Pena [(In re Pena)]*, 155 F.3d [1108] at 1111 [(9th Cir.1998)] (citing *In re Brunner*, 46 B.R. 752, 753 (S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir.1987)); *see also Jones v. National Payment Center (In re Jones)*, 242 B.R. 321, 325 (Bankr.E.D.Va.1998) (finding undue hardship means "more than 'unpleasantness' associated with repayment of a just debt").

*Anelli*, 262 B.R. at 8–9 (footnote omitted).

■ Although the Debtor testified about the seriousness of her medical condition and modest living arrangements, she did not call any expert witnesses to testify about her long-term prognosis. Although the Debtor intimated that her circumstances were unlikely to change, she did not testify that she would be unable to continue working part time or that, in the future, she would be unable to work a

sufficient number of hours to enable her to make modest payments to EMC. The Court is not convinced that she demonstrated that her present situation will continue indefinitely and that it is so extraordinary and hopeless that her student loan debt should be discharged. Although the nature of her illness is such that her symptoms appear to fluctuate, her medical records, which this Court admitted over the objection of EMC, show that her condition is managed and controlled with regular medication and medical appointments, including ones at the Brigham and Woman's Hospital Pain Management Center. Indeed, Dr. Elizabeth A. Stewart stated that on her present medications "she has been much more stable," and a physician at the Pain Management Center reported that in June of 2003 the Debtor had indicated that for the most part her pain was under control.

While it is true the Debtor's present income is insufficient to permit her to pay her student loans and still maintain a minimal standard of living, the Debtor has not established that her prospects for increasing her future income are so bleak as to warrant a discharge of the student loans. The Debtor is bright and has practical work experience in the accounting field. Her present focus appears to be exclusively on her physical symptoms and condition. Were her symptoms to abate or prove increasingly amenable to treatment, and were she to explore options such as working at home, she would be in a position to shift her focus to working a few more hours or even obtaining other employment that would enable her repay her student loans through the William D. Ford Federal Direct Loan Program.

This Court is not unsympathetic to the Debtor's financial circumstances and medical condition. Congress, however, has erected "a high hurdle to debtors seeking to discharge student loan obligations."

*Wegrzyniak v. United States of America (In re Wegrzyniak)*, 241 B.R. 689, 696 (Bankr.D.Idaho 1999). While the Debtor established that her physical condition was beyond her control, she did not convince the Court that she has acted in good faith because of her unequivocal rejection of the IRC plan. Simply put, she failed to present evidence that her condition will preclude her from ever earning the income she earned in 2001 or 2002 or that the federal income contingent plan would not provide a fair and equitable vehicle for the repayment of her student loans, particularly as it contains provisions that would reduce her payments to zero in the event her condition were to destabilize or deteriorate. *See Swinney v. Academic Fin. Servs. (In re Swinney)*, 266 B.R. 800, 806–07 (Bankr.N.D.Ohio 2001).

## IV. CONCLUSION

In accordance with the foregoing, the Court shall enter judgment in favor of the Defendant and against the Plaintiff.